CHRISTOPHER T., Douglas M., Christopher S., Minors by their Attorney, Sheila BROGNA, as Next Friend, Dr. and Mrs. S., Gail B., Mrs. H., on Behalf of Themselves and all Others Similarly Situated, Plaintiffs,

v.

SAN FRANCISCO UNIFIED SCHOOL DISTRICT, et al., Defendants.

No. C–80–4486 WHO.

United States District Court, N.D. California.

March 31, 1982.

Sheila L. Brogna, Legal Services for Children, Inc., San Francisco, Cal., George Kannar, Marcia Robinson Lowry, American Civil Liberties Union, Children's Rights Project, New York City, American Civil Liberties Union, Foundation of Northern California, San Francisco, Cal., for plaintiff children.

Marcia Rosen, San Francisco Lawyers' Committee For Urban Affairs, Robert A. Rosenfeld, Jessica S. Pers, Jonathan C. Dickey, Catharine S. Barnes, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for plaintiff parents.

Patrick S. McGovern, Truckee, Cal., Corrine Lee, Asst. Legal Advisor, San Francisco Unified School Dist., San Francisco, Cal., for defendant San Francisco Unified School Dist.

George Deukmejian, Atty. Gen. of the State of Cal., John J. Klee, Jr., Deputy Atty. Gen., San Francisco, Cal., for state defendants.

George Agnost, City Atty., Craig M. McCabe, Judith Swenson, Deputy City Attys., San Francisco, Cal., for defendant San Francisco Dept. of Social Services, Edwin Sarsfield and Joseph J. Botka.

## OPINION AND ORDER

ORRICK, District Judge.

The Education for All Handicapped Children Act ("EHA"), 20 U.S.C. § 1401 et seq., provides that a state must, in order to receive federal grants-in-aid under the Act, have in effect "a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). Where placement in a residential program is necessary to provide special education and related services to a handicapped child, the cost of such placement also must be borne by the state, but this requirement applies only where residential placement is required to address educational, rather than merely social, problems. 45 C.F.R. § 121a.302.

Plaintiffs are two emotionally disturbed children, Christopher S. and Douglas M., who, denied free residential placement by defendant San Francisco Unified School District ("SFUSD" or "the District"), submitted to the guardianship of the San Francisco Juvenile Court in order to obtain the needed funding from the San Francisco Department of Social Services ("DSS"), which conditions its funding on such guardianship. After making repeated and unsuccessful efforts to persuade the SFUSD to assume the cost of their children's residential placement, plaintiffs' parents brought this action under the EHA to compel the District to provide funding for their children's residential placement.[1]

Three motions are presently before the Court: defendant DSS' motion requesting the Court to abstain from deciding this case until the termination of pending state court proceedings involving many of the same issues; plaintiffs' motion for partial summary judgment as to Christopher S. and Douglas M.;[2] and defendant SFUSD's motion for leave to conduct further discovery pursuant to Federal Rule of Civil Procedure 56(f). For the reasons set forth below, DSS' motion for abstention is denied, SFUSD's motion for additional discovery is denied, and plaintiffs' motion for partial summary judgment is granted.[3]

I

A

Douglas M., a thirteen-year-old diagnosed as suffering from childhood schizophrenia and mild mental retardation, has attended special schools and residential treatment centers for emotionally disturbed children since he was seven. While living in Chicago in 1976–77, his parents, Mr. and Mrs. B., became unable to cope with Douglas' increasingly violent rages and tantrums, and placed him in the Pritzger Children's Psychiatric Unit for treatment.[4] When his parents moved to New York in July, 1977, Douglas was approved by the New York City Committee on the Handicapped for placement at Beaumont School, a privately operated residential education program. The cost of this residential placement was funded under the EHA by the New York City Board of Education and by the county where Douglas' parents lived, and continued until Douglas' father was transferred by his employer to San Francisco in 1980.[5]

---

1. Plaintiffs also contend that the DSS' conditioning of payment for residential placement upon a transfer of custody of the children from their parents to the Juvenile Court violates the Equal Protection and Due Process clauses of the United States Constitution, and also violates the provisions of Article I, Sections 11 and 21 of the California Constitution. This Court's disposition of plaintiffs' EHA claim, however, makes determination of these difficult constitutional questions unnecessary.

2. Plaintiffs' motion does not address the claims of Christopher T., a third named plaintiff whose procedural posture in this case differs markedly from that of Christopher S. and Douglas M., the other named plaintiffs. Nor does plaintiffs' motion address the class certification question, which is still pending.

3. This Opinion constitutes the Court's findings of fact and conclusions of law.

4. "Diagnostic Evaluation—Therapist," attached to declaration of Carolyn Campbell filed October 23, 1981.

5. Declaration of Fred B., filed October 23, 1981, at 2.

When Douglas' father learned that he would be moving, he visited San Francisco in order to arrange educational placement for Douglas. Although he contacted several employees of the District and advised them of his son's difficulties and of his previous placement at Beaumont, the District did not undertake to evaluate Douglas to determine whether he was entitled to EHA funding, but instead referred him to the DSS.[6] The DSS informed him that in order to obtain state funding for his son's residential placement, custody of Douglas would have to be surrendered to the Juvenile Court. Mr. B. questioned why this procedure was necessary when it had not been required in New York, and was told simply that Juvenile Court intervention was a prerequisite to funding[7] in San Francisco.

Unable to afford the high cost of residential placement on their own, and having been told that they could obtain funding for such placement only by going through a dependency hearing in the Juvenile Court, Douglas' parents agreed to the placement through the DSS. In a report dated September 24, 1980, the DSS stated that it was critical to place Douglas in a residential program as quickly as possible, and recommended that the court commit Douglas to DSS custody.[8] Pursuant to California law,[9] a dependency petition was subsequently filed with the Juvenile Court, and on Octo-

ber 9, 1980, the court sustained the petition on the ground that Mr. and Mrs. B. were unable to properly care for Douglas because he required treatment in a residential center.[10] After a brief stay at the McAuley Institute in San Francisco, during which extensive diagnostic evaluations were performed in order to determine the treatment and educational program that Douglas should receive,[11] long-term residential placement was recommended, and Douglas was placed at the Devereux Foundation in Santa Barbara, where he is currently living.

## B

Christopher S. is a fourteen-year-old adopted child with a long history of family rejection and frustrated social and emotional progress. When they adopted Christopher in 1978, Dr. and Mrs. S. knew him to be a "hard-to-place" child. His behavior deteriorated rapidly soon thereafter, and he became alternately sullen and defiant, had raging temper tantrums, barricaded himself in his room for hours at a time, and ran away on several occasions.[12]

Attempting to deal with Christopher's increasingly difficult behavior, Dr. and Mrs. S. sought psychiatric counseling for Christopher and therapy for the family, but it soon became apparent that the problems were

---

6. *Id.* at 3–4. Mr. B. stated that in telephone conversations with two SFUSD employees he was advised that the District only paid for "education tuition" and would not pay for the cost of residential placement. *Id.* at 4.

7. SFDSS/SFJCPD Admissions, Fact Nos. 113, 114, contained in defendants' pretrial brief pursuant to The Manual for Complex Litigation § 3.30, filed August 21, 1981, at 12.

8. *Id.,* Fact No. 120 at 13.

9. Section 300 of the California Welfare & Institutions Code provides:
    "Any person under the age of 18 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge such person to be a dependent child of the court:
    (a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising such

care or control, or has no parent or guardian actually exercising such care or control. No parent shall be found to be incapable of exercising proper and effective parental care or control solely because of a physical disability, including, but not limited to, a defect in the visual or auditory functions of his or her body, unless the court finds that the disability prevents the parent from exercising such care or control."

10. *See* petition for declaration of dependency under California Welfare & Institutions Code § 300(a), attached as Exhibit A to Declaration of Sheila L. Brogna in support of plaintiffs' motion for preliminary injunction filed September 4, 1981.

11. Declaration of Joseph Narvid filed October 23, 1981, at 2.

12. Declaration of William S. filed October 23, 1981, at 1.

too severe for this approach to be effective. In August, 1978, at their family therapist's suggestion, Dr. and Mrs. S. placed Christopher at the McAuley Institute in San Francisco for diagnosis, evaluation, and planning.[13] Soon after Christopher's arrival at McAuley, however, his parents were informed that he could not remain as an in-patient there for more than seventy-two hours unless a dependency petition were brought.[14] When Dr. S. sought advice from the DSS, he was told that Christopher could not simply be placed at McAuley by the DSS, but that an uncontested Juvenile Court dependency hearing could accomplish that result with no significant diminution of Dr. and Mrs. S.' parental rights over Christopher.[15] Christopher's parents agreed to the procedure, and on August 18, 1978, the dependency petition was approved; Christopher became a ward of the court and, as such, the legal responsibility of the DSS.[16]

In November, 1978, the McAuley staff recommended that Christopher be given long-term residential placement.[17] An Individual Education Program ("IEP")[18] study was conducted in December, and the IEP Committee also recommended residential placement. Christopher was then placed at the Trinity School in Ukiah, California, where, still under the legal custody of the DSS, he is currently living.

Throughout this period, Dr. and Mrs. S. had been unaware that funding for Christopher's placement might be available under the EHA; the SFUSD had never suggested that such funding might be provided by the District. Dr. and Mrs. S. only learned of the EHA in early June, 1979, when they were told by a McAuley staff member that EHA funding might be available without the need for Juvenile Court custody of their son.[19] At a meeting in June, 1979, Edwin Sarsfield, General Manager of the DSS, confirmed that EHA funding might be available, and recommended that Dr. and Mrs. S. apply to the District.[20] Another DSS employee subsequently informed them

13. *Id.* at 1–2.

14. *See* note 8, *supra.*

15. Declaration of William S. at 3.

16. Findings and Order of Juvenile Court of the Superior Court of the City and County of San Francisco, attached as Exhibit 3 to declaration of Sheila Brogna, filed October 23, 1981.

17. Declaration of William S. at 4.

18. 20 U.S.C. § 1401(19) provides:
   "The term 'individualized education program' means a written statement for each handicapped child developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of handicapped children, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular education programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved."

19. Declaration of William S. at 6.

20. *Id.* at 5–6. In the spring of 1979 the San Francisco District Attorney's Office had initiated an investigation of Dr. and Mrs. S.'s receipt of funding for Christopher from the DSS. Mr. Sarsfield wrote the District Attorney's Office on June 13, 1979, advising them that the DSS was initiating steps to fund Christopher's placement under the EHA and that such funding should have been pursued earlier but had not been due to the statute's recent enactment, and the resulting confusion as to its requirements. Mr. Sarsfield also requested the District Attorney's Office to return Christopher's file to the DSS so that this process could go forward. Letter from Edwin Sarsfield to Nancy Keane, Director, Family Support Bureau of San Francisco District Attorney's Office, attached as Exhibit 1 to declaration of William S. The DSS did not obtain EHA funding for Christopher, however, and the District Attorney's Office filed suit against Dr. and Mrs. S. in August, 1979, to recover the cost of Christopher's care at Trinity. That action was dismissed in September, 1980.

that another IEP would have to be conducted for Christopher.[21]

When Dr. S. contacted the District in an attempt to obtain EHA funding, however, he was told that Christopher already had a current IEP assessment, and that because Christopher had been placed at Trinity by the DSS, he was the Ukiah Unified School District's responsibility.[22] Dr. and Mrs. S. were thus in a dilemma: they had agreed to DSS placement only after being told it was the only way to obtain funding for their son's placement, but were now being told that the SFUSD could not provide the funding under the EHA because the DSS had become involved in the case.

It was at this point that Dr. and Mrs. S. obtained legal counsel. In November, 1979, they requested that the SFUSD provide a due process hearing concerning the District's refusal to pay for their son's residential placement, and on December 18, an informal meeting was held. At this meeting funding was once again denied, this time on the ground that Christopher's difficulties requiring residential placement were social and behavioral, rather than educational, and that Christopher consequently did not qualify for funding under the

EHA.[23] Dr. and Mrs. S. were again advised that in order for the SFUSD to provide funding for Christopher's residential placement a further IEP would have to be conducted.[24]

Over the next several months various efforts were made by Dr. and Mrs. S. to persuade the SFUSD to assume financial responsibility for Christopher's education. These efforts were largely unsuccessful. An IEP meeting for Christopher was finally held on April 15, 1980, but at that meeting the SFUSD again refused to authorize residential placement for Christopher.[25] A state-level due process hearing to protest this decision was requested, and that hearing was scheduled by the State Department of Education for September 15, 1980.[26]

On July 12, the state-level hearing was cancelled, apparently due to the SFUSD's representations that either the Ukiah Unified School District or the DSS, rather than the SFUSD, were the agencies responsible for Christopher.[27] Counsel for Christopher and for Dr. S. and Mrs. S. protested this cancellation, but the hearing was not rescheduled until six weeks after this federal court action was filed on December 16, 1980. After several jurisdictional chal-

21. Letter from Connie Benz, DSS, to Dr. S. dated July 23, 1979, attached as Exhibit 2 to declaration of William S.

22. Letter from Linda Warner, SFUSD Central Assessment Unit Coordinator, to William S. dated October 15, 1979, attached as Exhibit 3 to declaration of William S.

23. Funding was denied also because the Trinity School, where Christopher was living, was located in Ukiah and thus was outside the SFUSD's jurisdiction, and because Trinity was not "certified" by the State Department of Education. See declaration of William S. at 7–8, and Exhibits 3 and 4 attached thereto. These justifications for denying funding under the EHA are without merit in this case, however, due to the fact that Christopher was placed at Trinity solely because the SFUSD failed to carry out its statutory obligations under the EHA. See also n. 25, infra.

24. Declaration of William S. at 8. See also letter from Joyce Pringle, EHA Compliance Officer, SFUSD, dated December 19, 1979, attached as Exhibit 4 to declaration of William S.

Christopher's legal counsel objected to the need for any further IEP evaluations, contending that the extensive evaluations previously administered at McAuley were sufficient to permit the SFUSD to determine Christopher's needs. The SFUSD, however, insisted then, as it continues to insist now, that further evaluations were required. See declaration of Sheila Brogna at 5.

25. Declaration of William S. at 8–9; declaration of Sheila Brogna at 5.

26. 20 U.S.C. § 1415(c) provides that, where a local education agency initially denies a party's complaint,

"any party aggrieved by the findings and decision rendered in such a hearing may appeal to the State educational agency which shall conduct an impartial review of such hearing. The officer conducting such review shall make an independent decision upon completion of such review."

27. Declaration of Sheila Brogna at 5.

lenges were rejected,[28] the hearing on the merits was conducted on June 17, 18, and 23, 1981. On August 5, 1981, the State Hearing Officer issued her decision, finding that Christopher was a seriously emotionally disturbed child as defined by federal and state law; that Christopher had needed residential placement since December, 1978; and that the SFUSD had been the local agency financially responsible for Christopher's placement since December, 1978.[29] The State Hearing Officer ordered the District to reimburse the DSS and Christopher's parents for the costs incurred due to the SFUSD's failure to pay for Christopher's placement; to assume the cost of Christopher's placement at Trinity throughout the remainder of the 1981–82 school year; and to conduct a new IEP for Christopher within two weeks of her decision.[30]

Despite the State Hearing Officer's decision, the SFUSD failed to take steps to comply with her order, but instead moved to withdraw Christopher from Trinity and to administer further psychiatric examinations. It also filed a petition for review by writ of mandate of the State Hearing Officer's decision in the state court, but that proceeding was stayed by this Court's order to hold things *in statu quo* pending the

Court's resolution of the federal statutory issues before it.

Plaintiffs filed their motion for partial summary judgment on October 23, 1981, and DSS and SFUSD filed motions for abstention and for additional discovery under Federal Rule of Civil Procedure 56(f).

## II

Before the Court can reach plaintiffs' motion for partial summary judgment, it must address the preliminary motions, namely, DSS's motion for abstention, and SFUSD's motion for additional discovery under Federal Rule of Civil Procedure 56(f).[31]

### A

◼ The DSS asks this Court to abstain from deciding the issues before it in this case until the SFUSD has had an opportunity to appeal in state court (by a petition for review by writ of mandate) from the decision of the State Hearing Officer with respect to Christopher. Viewed simply as a motion for abstention, DSS' motion is unsupportable. Jurisdiction in this case is proper under the EHA, 20 U.S.C. § 1401 *et seq.*,[32] the Rehabilitation Act of 1973, 29

---

**28.** The State Hearing Officer determined that the fact that Christopher was living at the Trinity School in Ukiah did not vest jurisdiction over him, for purposes of determining his rights under the EHA, in the Ukiah Unified School District, since the decisions to place him at Trinity had all been made in San Francisco, where Christopher then, and his parents still, resided. Preliminary Jurisdictional Ruling of Hearing Officer of Administrative Hearings, March 17, 1981, attached as Exhibit F–3–F–5 to plaintiff's motion for partial summary judgment.

**29.** Decision of State Hearing Officer issued August 5, 1982, attached as Exhibit H to plaintiffs' motion for partial summary judgment.

**30.** *Id.* at 3.

**31.** Federal Rule of Civil Procedure 56(f) provides:
"Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits

to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

**32.** The District argues that jurisdiction under 20 U.S.C. § 1415(e)(2), which permits "any party aggrieved" by the findings and decision of the State Hearing Officer to bring a civil action in the district court to enforce his rights under the EHA, is not proper because Christopher *won* in the state hearing, and thus is not "aggrieved."

A similar argument was made in *Hark v. School District of Philadelphia,* 505 F.Supp. 727 (E.D.Pa.1980). In *Hark* the parents, after having placed their children in an out-of-state school, received a favorable ruling from the state hearing officer as to the propriety of that placement. The matter of reimbursement for personal expenditures was raised in the hearing but never resolved, but the parents, believing they had received a favorable decision in all respects, never appealed the decision. When reimbursement was subsequently denied by the district, the parents brought suit in federal court under 20 U.S.C. § 1415(e)(2). The court, rejecting the district's argument that there was

U.S.C. § 794,[33] 28 U.S.C. § 1331, and 42 U.S.C. § 1983. It is well-settled that a court should abstain from exercising jurisdiction over a case properly before it only under exceptional circumstances. In *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1062, 3 L.Ed.2d 1163 (1959), Justice Brennan wrote that:

> "The doctrine of abstention * * * is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest."

None of the narrow exceptions to the obligation of federal courts to decide cases, such as this one, that raise issues of federal law are applicable to this case. This is not a case involving a difficult interpretation of unsettled state law. *See Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Nor is it a case that implicates important considerations of state policy, requiring abstention in the interest of federal/state comity, *see Louisiana Power & Light Co. v. Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); to the contrary, rights under federal statutes are being asserted here. Thus, because none of the traditional grounds for abstention exist in this case, this Court cannot and will not absent some other defect in its jurisdiction, stay its hand to allow the pending state proceeding to go forward.[34]

no adverse hearing decision to be aggrieved by and to appeal from, stated that it would be "[a]nomalous if, under a federal statute which contemplated recourse to the federal courts to examine state administrative decisions alleged not to fulfill the promise of a federally funded program, a deficient state administrative procedure could preclude review, especially where the gravamen of the complaint is precisely that deficiency." *Id.* at 731. It would be equally anamolous to hold that Christopher is not "aggrieved" by, and cannot appeal from, the decision of the State Hearing Officer in this case, for that decision has had little practical value to plaintiffs because the District failed entirely to comply with its directions to assume the cost of Christopher's residential placement and to reimburse Dr. and Mrs. S. for the costs of the placement they had previously paid. *See* discussion at pp. 1116–1117, *infra.* To hold that a losing defendant may negate the effect of an unfavorable decision, and simultaneously block further redress to the courts, by simply ignoring that decision would be absurd. Plaintiff is as "aggrieved" by the practical outcome of the State Hearing Officer's decision in his favor as he would have been by a decision in favor of the District, and jurisdiction under 20 U.S.C. § 1415(e)(2) is therefore proper.

33. The Rehabilitation Act of 1973, 29 U.S.C. § 794, provides:

"No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any programs or activity

conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is submitted to such committees."

Because there is a significant degree of overlap between the Rehabilitation Act and the EHA, *see Boxall v. Sequoia Unified High School District,* 464 F.Supp. 1104, 1110–1111 (N.D.Cal. 1979), the Court's analysis of the issues presented by this case has focused upon plaintiffs' rights under the EHA.

34. Although it would be an inefficient use of the judicial system to permit two cases involving essentially the same facts and legal principles to proceed simultaneously, that fact does not under the circumstances presented here require the federal court to abstain. First, this case was filed prior to the state mandamus action, and as the court noted above, raises genuine and substantial questions of federal law. Nor will this Court's retention of jurisdiction result in two courts proceeding simultaneously, and inefficiently, along parallel tracks. It was to avoid precisely that result that this Court ordered the parties not to pursue, during the pendency of this action, other avenues of relief. Finally, as will be explained more fully below, defendants, and particularly the SFUSD, have grudgingly responded to plaintiffs' demands under the EHA only after legal pressure

## B

The state defendants also assert, in what is essentially an exhaustion of remedies argument, that § 1415 of the EHA, and the California Education Code sections which implement that statute, require the local education agency to conduct the assessment of a handicapped child which is necessary to determine that child's IEP. This argument, that the District alone has the statutory responsibility and right to assess these handicapped children's needs, and should be permitted to do so before this action goes forward, is the same argument that the District relies upon in seeking leave under Federal Rule of Civil Procedure 56(f) to conduct further evaluation of plaintiffs prior to decision on plaintiffs' summary judgment motion. The Court's disposition of this argument, therefore, applies both to DSS' motion for abstention and to SFUSD's motion for further discovery under Rule 56(f).

Defendants contend that Douglas has never been evaluated by the District, and has never sought state-level administrative review of the District's refusal to pay for his educational placement. Christopher, it is conceded, has exhausted his state-level administrative remedies by successfully appealing the District's denial of free residential placement to the State Hearing Officer, who ordered the District to pay for residential placement. Nevertheless, defendants argue that the District has the right under § 1415(e)(2) of the EHA to appeal the State Hearing Officer's decision in the state courts, and was in fact attempting to do so when this Court ordered the parties to hold matters *in statu quo*. Defendants argue, therefore, that the state mandamus challenge to the State Hearing Officer's ruling should be allowed to go forward before this Court reviews the District's conduct toward Christopher. Douglas, they argue, must be evaluated by the District under the procedures set out in the EHA and the California Education Code, and must, if the District

denies his claim, additionally appeal such a denial to the State Hearing Officer. Only after these measures are taken, argue defendants, will Douglas' claim under the EHA properly be before this Court. Finally, the SFUSD argues that it has not yet had the opportunity to itself evaluate Douglas and Christopher in order to determine whether they are entitled to free residential placement under the EHA, and cannot adequately respond to plaintiffs' motion for summary judgment on that issue until they have done so. SFUSD moves under Federal Rule of Civil Procedure 56(f) to be permitted to conduct its own psychiatric evaluation of Douglas and Christopher in accordance with the procedures set out in the EHA and the California Education Code.

Defendants are correct in their contention that a person seeking to enforce rights granted under the EHA must first exhaust the administrative remedies provided by the Act before he may bring a civil action to enforce those rights in the district courts. *Riley v. Ambach,* 3 EHLR 552:410 (2d Cir.1980); *Armstrong v. Kline,* 476 F.Supp. 583, 601 (E.D.Pa.1979), *remanded on other grounds, Battle v. Pennsylvania,* 629 F.2d 269 (3d Cir.1980). The law is equally settled, however, that the administrative remedies provided by the EHA need not be exhausted where exhaustion would be a futile gesture, *Armstrong, supra,* 476 F.Supp. at 587, or where the administrative remedies available do not provide plaintiffs with an adequate means for redressing their grievances, *Monahan v. Nebraska,* 645 F.2d 592, 597 (8th Cir.1981); *Riley, supra,* 3 EHLR at 413–14. The facts presented to this Court bring this action squarely within these exceptions to the exhaustion requirement, for they reveal that the local education agency responsible for administering the testing and placement provisions of the EHA, the SFUSD, over a period of many months consistently refused to comply with

has been applied; reducing that pressure by staying this action would, in the Court's judgment, be inconsistent with the Court's obligation to protect and to enforce the federal rights

provided by the EHA. This consideration alone would in fact be sufficient reason to deny defendants' motion for abstention.

its obligation under the EHA to extend advice or assistance regarding the Act to the families of children who might be eligible for funding under its provisions.

Despite the fact that his son had previously been placed and funded under the EHA in a residential program in New York, Mr. B. was never advised that similar placement might be available in San Francisco, but was instead referred to the Department of Social Services, where funding for Douglas' placement could only be accomplished through a Juvenile Court dependency proceeding.[35] Similarly, Dr. S. was never advised that his son might have certain rights under the EHA, and indeed, only learned of the Act's existence (from a source other than the SFUSD) after Christopher had been made a ward of the Juvenile Court. Moreover, when Dr. and Mrs. S. learned of the EHA and applied to the District for federal funding, their requests were denied because Christopher had been placed by the DSS at the Trinity School in Ukiah, which the SFUSD claimed was outside of its jurisdiction. This was, in effect, an attempt by the SFUSD to refer away its obligations under federal law, because Christopher was surrendered to the custody of the DSS, and ultimately placed at Trinity, only after the SFUSD informed his parents that funding for residential placement could be obtained only through that procedure.[36] Even after the State Hearing Officer found that the SFUSD had failed to comply with the requirements of the EHA, and ordered the District to pay for Christopher's future placement and to reimburse the DSS and Christopher's parents for the cost of his previous placement, the SFUSD took no action to comply with that order, but instead began taking steps to remove Christopher from Trinity and to administer further psychiatric evaluations.

■ Although exhaustion of remedies has been required by courts in EHA cases, *see Riley, supra,* courts have generally been unwilling to erect rigid procedural obstacles to suits seeking to enforce compliance with the substantive provisions of the Act. *See Tokarcik v. Forest Hills School District,* 665 F.2d 443 (3d Cir.1981) (refusing to apply state statute of limitations to defeat EHA claim); *North v. District of Columbia Board of Education,* 471 F.Supp. 136 (D.D.C.1979). The district court in *North* rejected defendant's exhaustion argument in language that seems directly applicable to this case:

"[I]t is unclear to what remedies defendants refer [in their argument that plaintiff must exhaust his administrative remedies] since an administrative determination was previously made that plaintiff needs residential treatment. The issue in dispute is not whether he needs such treatment but rather who should provide

**35.** The state defendants have sought to avoid any responsibility for the SFUSD's refusal to fund Douglas' and Christopher's residential placements under the EHA, arguing that it was the SFUSD's decision and, in fact, that it was a State Hearing Officer who ruled in favor of Christopher at the state-level due process hearing. The state cannot, however, avoid its obligations under the EHA so easily, because § 1412(6) expressly makes the state educational agency responsible for ensuring compliance with the Act:

"The State educational agency shall be responsible for assuring that the requirements of this subchapter are carried out and that all educational programs for handicapped children within the State, including all such programs administered by any other State or local agency, will be under the general supervision of the persons responsible for educational programs for handicapped children in the State educational agency and shall meet

education standards of the State educational agency."

*See also Kruelle v. New Castle County School District,* 642 F.2d 687, 696–97 (3d Cir.1981). The San Francisco Department of Social Services, an agency administered by a political subdivision of the State of California, was involved with Douglas' and Christopher's cases from the beginning, yet failed to ensure that the local education agency, the SFUSD, satisfied the requirements of the EHA. The Court is not suggesting that the state, or for that matter, the District, acted maliciously toward these children; it is suggesting that bureaucratic inertia has led to the disregard of statutory obligations which it is this Court's duty to enforce.

**36.** The State Hearing Officer found that the SFUSD "was integrally involved with Petitioner's placement in the non-public school in December 1978, and agreed that Trinity would be the placement." Decision of State Hearing Officer, Finding No. 2; note 29, *supra* at 2.

it. A further review of plaintiff's needs seems superfluous in light of the ample record of psychological, emotional, and educational evaluations. * * * It may be worth noting in this connection that in the course of plaintiff's efforts to secure action from the defendants, the latter appear to have committed wholesale violations of plaintiff's procedural rights."

*Id.* at 141 n. 8. It is plain that Christopher's parents have taken all the measures to secure their son's rights under the EHA that they reasonably can be expected to take; they have appealed the District's denial of funding for residential placement to the State Hearing Officer, but have, despite a favorable ruling, still failed to receive any of the relief they seek. Indeed, those actions by the District that might conceivably be mistaken for compliance with the EHA, such as the District's recent attempts to reevaluate plaintiffs and its appeal by writ of mandamus of the Hearing Officer's decision in the state courts, have come only under the direct pressure created by this federal court action. To remove that pressure by requiring Christopher to resort again to administrative machine.y that has proved unresponsive would be counterproductive and futile, and will not be required by this Court.

■ Similarly, Douglas will not be required to exhaust procedural avenues of "relief" that have been used only to delay and frustrate the objectives of the EHA. Both Douglas and Christopher have been evaluated on numerous occasions by psychiatric and educational experts whose professional credentials or expertise have never been challenged by defendants.[37] To withdraw these children from their education programs at Devereux and Trinity in order to conduct further tests, not because such tests are necessary but because the District asserts that the statute and regulations permit it to do the testing, would do nothing to further the purposes of the Act, but would do further damage to the children. The evaluation procedures under the EHA, and the safeguards available in connection with those procedures, were intended to protect parents and children whom the responsible local agency has treated unfairly; they were not intended to be used by the agency itself as a means of delaying the provision of funding available under the Act, nor were they intended to insulate the agency from federal court review of its conduct. *See Tokarcik, supra,* 665 F.2d at 450.[38]

**37.** SFUSD's position that it lacks sufficient information to respond to plaintiffs' motion for partial summary judgment, and should, therefore, be permitted to conduct its own evaluations of Douglas and Christopher under Federal Rule of Civil Procedure 56(f), is undermined by the District's *past actions.* Counsel for Douglas requested the SFUSD in November, 1980, to convene an IEP proceeding for Douglas; in a letter from the SFUSD's "Program Manager" dated November 24, 1980, the District declined to do so, noting that

"Douglas current I.E.P. from New York and recent assessment material from McAuley should be sufficient information for the development of an I.E.P. by the school district receiving him. Given the circumstances, an I.E.P. from our district would serve no practical purpose."

Letter from Hal Solin to Sheila Brogna dated November 24, 1980, attached as Exhibit D to supplemental memorandum of plaintiffs in support of motion for partial summary judgment filed December 7, 1981. Christopher S., moreover, actually *was* evaluated by the District, most recently on April 15, 1980, during an IEP which the District insisted upon conducting. *See* IEP Review of April 15, 1980, attached as Exhibit E to supplemental memorandum of plaintiffs, *supra.* Other evaluations of these children by staff professionals at the Devereux Foundation and at the Trinity School have been on file with this Court since October, 1981. There is no explanation, and no discernable reason, why these evaluations do not provide the SFUSD with the information it needs to respond to plaintiffs' motion.

**38.** The broad scope of review under § 1415(e), which permits the reviewing court to hear evidence not contained in the administrative record in what is essentially a trial *de novo* and to reach an independent judgment based on a preponderance of the evidence, demonstrates the courts' broad authority to supervise compliance with the EHA. *See* S.Rep. No. 455 (Conf. Rep.) 94th Cong., 1st Sess. 50, *reprinted in* [1975] U.S.Code Cong. & Ad.News 1480, 1503; *Tokarcik v. Forest Hills School District,* 665 F.2d 443 at 448 (3d Cir.1981). The breadth of this responsibility is further demonstrated by the delegation to the courts in § 1415(e)(2) of the power to grant "such relief as the court determines is appropriate," an exceptionally broad grant of remedial authority. It would be

■ For these reasons, the motion for abstention made by DSS is denied, as is SFUSD's motion under Federal Rule of Civil Procedure 56(f) for leave to conduct further psychiatric evaluations of Douglas and Christopher. The evaluations presently on file are voluminous and comprehensive, and are entirely sufficient to permit the District to respond to plaintiffs' claim that residential placement is an essential component of the free appropriate education they are statutorily entitled to receive. Therefore, additional testing is unnecessary, and will not be required.

### III

■ As the Court noted at the outset, the EHA requires states that receive federal funds under the Act to put into effect programs and procedures designed to provide handicapped children [39] with a "free appropriate public education." 20 U.S.C. § 1412(1). The term "free appropriate public education" has not been precisely defined, and the EHA leaves to the states the responsibility for developing educational plans which satisfy the requirements of the Act. 20 U.S.C. § 1412; *see also Kruelle v. New Castle County School District,* 642 F.2d 687, 691 (3d Cir.1981). Two components of a state plan designed to provide a free appropriate public education—"special education" and "related services"—are, however, specifically defined in the Act. "Special education" is

"specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, in-

cluding classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions."

20 U.S.C. § 1401(16). "Related services" are

"transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children."

20 U.S.C. § 1401(17). That residential placement such as that sought by Douglas and Christopher may be available as a "related service" under the Act is indisputable; the regulations promulgated under the Act provide:

"If placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care and room and board, must be at no cost to the parents of the child.

Comment. This requirement applies to placements which are made by public agencies for educational purposes, and includes placements in State-operated schools for the handicapped, such as a State school for the deaf or blind."

---

inconsistent with this broad supervisory power for a court to permit procedural safeguards intended to protect handicapped children to frustrate the aims of the Act. Senator Harrison Williams, the principal author of the EHA, expressed this concern on the floor of the Senate:

"I want to underscore that exhaustion of the administrative procedures established under this part should not be required for any individual complainant filing a judicial action in cases where such exhaustion would be futile either as a legal or practical matter."

121 Cong.Rec. 37416 (1975) (S.Conf.Rep.).

**39.** "Handicapped children" are defined by the EHA as

"mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, or other health impaired children, or children with specific learning disabilities who by reason thereof require special education and related services."

20 U.S.C. § 1401(1).

There can be no dispute in this case over whether Douglas and Christopher are "handicapped" within the meaning of § 1401 of the EHA; clearly, they are. The disputed issue is whether they require residential placement in order to meet educational, rather than social and behavioral, needs.

45 C.F.R. § 121a.302. If residential placement is necessary in order for Douglas and Christopher to receive any educational benefit from special education, therefore, under the EHA the District must pay the cost of that placement. As the Court of Appeals for the Third Circuit put it in *Kruelle,* which considered almost precisely the same question, the issue before the court is

> "whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process."

*Kruelle, supra,* 642 F.2d at 693.[40]

Both Douglas and Christopher have been evaluated by psychiatric experts on numerous occasions, and these experts have all recommended residential placement as the best means available for meeting these children's educational needs. Douglas was placed in such a program, funded under the EHA, at the Beaumont School in New York, and succeeding evaluations have only reemphasized the importance of a highly structured, nurturing environment to this

moderately retarded, schizophrenic child's development.[41] The psychiatrists and psychologists who evaluated Christopher at the Trinity School also recommended residential placement,[42] and the decision of the State Hearing Officer ordering the SFUSD to provide such placement expressly found that the school district

> "offered no testimony that would come close to refuting the reports made by psychologists, social workers, teachers, and others closely associated with Petitioner that he is indeed a child with a schizoid personality, totally incapable of functioning in a normal home setting, and in need of continued residential treatment from the time he first entered the McAuley Institute in August, 1978."

Decision of State Hearing Officer at 4.

■ Defendants, however, do not contend that Douglas and Christopher would not benefit from residential placement. Rather, they argue that these children require such placement as a means of addressing social and emotional, rather than educational, problems. When confronted with

40. Title 5, California Administrative Code § 3209(a) authorizes residential placement

> "when no appropriate day program is available to meet the specific educational needs of *the individual within a reasonable distance* from the home of the individual in either a public or non-public school; or the individual requires education and related interventions by a multi-disciplinary team which cannot normally be provided in a day program."

As with the EHA, residential placement is authorized under this provision in cases in which it is necessary in order to meet the individual child's "educational needs." A court's inquiry under state law is, therefore, the same as under the EHA.

41. Douglas' "Discharge Evaluation Summary" from the McAuley Institute concludes with this recommendation:

> "Long-term residential treatment with a center with a capacity to deliver a highly individualized educational experience in a well-structured and emotionally nurturing environment would be the ideal setting in which Douglas might continue the positive work already undertaken in the Beaumont Program."

Exhibit 2 to declaration of Narvid. The "Educational Evaluation" conducted at McAuley reached a similar conclusion that

> "Doug requires an educational setting which is designed to address both his emotional and learning problems. A residential facility which is lacking in either a strong therapy program or a highly specialized educational program is likely to be less than optimally successful."

"Educational Evaluation" from McAuley Institute attached as Exhibit 2 to declaration of Narvid. *See also* declarations of Carol A. Purich, Carolyn Campbell, Danilo Zogorean, and Jerry Skipp, filed in support of plaintiffs' motion for partial summary judgment filed October 23, 1981.

42. Dr. Benjamin Lewis, a clinical psychologist who worked with Christopher at the Trinity School, stated in his declaration that "the requirement of dealing with the underlying illness rather than the symptomatic behavior is what makes residential treatment more effective than living at home," and noted that Christopher requires

> "a therapeutic program that closely monitors, structures, and coordinates Chris' 24 hour day; [and] a residential treatment program aimed at working out the child's psychologic disturbance in an atmosphere conducive to his personal, academic and social progress * * *."

this argument in other cases brought to enforce rights under the EHA, however, courts have almost without exception ordered school districts to provide the residential placement sought. In *North, supra,* a case quite similar to the present case, a multiple-handicapped child who was enrolled in a residential placement program was, as a condition to his continued receipt of funding for his placement, required to submit to a neglect proceeding which would transfer custody of him from the parents to the social services department. When the parents brought suit to compel the education agency to provide the funding, the agency resisted on the ground that the child's problems were social and behavioral, rather than educational, and thus not its responsibility. The district court rejected the argument, expressing its doubt as to the viability of the distinction between social/emotional and educational disabilities made by the school district:

> "It may be possible in some situations to ascertain and determine whether the social, emotional, medical, or educational problems are dominant and then to assign responsibility for placement and treatment to the agency operating in the area of that problem. In this case, all of these needs are so intimately intertwined that realistically it is not possible for the Court to perform the Solomon-like task of separating them."

*North, supra,* 471 F.Supp. at 141. In *Kruelle,* the Court of Appeals for the Third Circuit reached a similar result, although it did not, as had the district court in *North,* state simply that it could not determine which of plaintiff's problems could be addressed only by residential placement and, therefore, order the placement on that basis. Rather, the court in *Kruelle* empha-

sized that a finding that emotional and social needs are in a particular child's case unseverable from that child's educational needs "is the very basis for holding that the services are an essential prerequisite for learning." *Kruelle, supra,* 642 F.2d at 692.

This Court finds that both Douglas and Christopher require residential placement in order to benefit from special education, and the reports and recommendations of the psychologists and psychiatrists that have been presented to the Court amply support this finding.[43]

Accordingly, IT IS HEREBY ORDERED that:

1. SFUSD shall immediately assume the cost of the residential placements of Douglas M. and Christopher S.

2. SFUSD shall, within thirty (30) days of the date of this Opinion and Order, convene IEP conferences for Douglas M. and Christopher S., which shall formulate IEP's containing recommendations for residential placement.

3. SFUSD shall keep Douglas M. and Christopher S. in their current placements at Devereux and Trinity, respectively, through June, 1982.

4. SFUSD shall reimburse DSS for any costs of care incurred by DSS for Christopher S. since December, 1978, and for Douglas M. since October, 1980.

5. SFUSD shall, upon proper proof to and order by this Court, reimburse the parents of Douglas M. and Christopher S. for any costs of care for their children incurred by them as a result of SFUSD's failure to pay for their residential placement.[44]

6. DSS shall immediately take whatever measures are necessary to dismiss the dependencies of Douglas M. and Christopher

---

**43.** Although determinations of this nature obviously must be made on an individualized, case-by-case basis, and the Court in this case has made such an individualized determination as to each plaintiff, it is worthwhile to note that courts have, in cases involving children with histories and disabilities similar to those of Douglas and Christopher, concluded that those children were entitled to residential placement under the EHA. *See, e.g., Hines v. Pitt County Board of Education,* 497 F.Supp. 403 (E.D.N.C. 1980); *Howard S. v. Friendswood Independent*

*School District,* 454 F.Supp. 634 (S.D.Tex. 1978).

**44.** Although there is some uncertainty over whether damages are generally available under the EHA, *compare Anderson v. Thompson,* 658 F.2d 1205 (7th Cir.1981), *with Boxall v. Sequoia Unified School District,* 464 F.Supp. 1104 (N.D. Cal.1979), there can be no doubt that the limited compensatory damages that the Court awards here are proper on any one of several grounds. Although the Court of Appeals for

S. with the Juvenile Court, and to return both children to the legal custody of their parents.

7. Counsel for plaintiffs shall file a certificate of counsel showing the costs of care incurred by the parents of Douglas M. and Christopher S. as a result of the District's failure to pay for residential placement, and shall lodge with the Court a judgment approved as to form by defendants.

8. Counsel for the parties shall prepare and file with the Court by April 19, 1982, a joint certificate of counsel setting forth what additional steps remain to be taken in this lawsuit and agreeing on a schedule for such further proceedings.

the Seventh Circuit concluded in *Anderson* that the EHA's authorization to the district courts to grant "such relief as the court determines is appropriate" did not include awards of monetary damages, 658 F.2d at 1209–13, the court noted that an exception to this general rule exists in cases in which "the defendant has acted in bad faith by failing to comply with the *procedural provisions of* [§ 1415] *in an egregious fashion.*" *Id.* at 1214. The District's actions toward Douglas and Christopher bring this case squarely within this exception, so that even if the *Anderson* court were correct in finding that compensatory damages were not intended to be available generally for violations of the EHA, a conclusion the Court does not necessarily share but does not reach here, the limited compensatory damages which this Court awards would nevertheless be proper. Damages are also properly awarded here under § 505 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a, which makes available to any person aggrieved by a violation of the Act the "remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964." Although the courts are split on the question of whether damages are available under § 504, *compare Boxall, supra* note 43, 464 F.Supp. at 1111–1112 (damages unavailable) *with Patton v. Dumpson,* 498 F.Supp. 933, 937 (S.D.N.Y. 1980) (damages available), the inadequacy of the Rehabilitation Act's remedial procedures, under which administrative sanctions such as a termination of funds to a discriminating agency are available but damages for the party discriminated against are not, *see* 45 C.F.R. §§ 80.8, 80.7(c), 80.7(d)(2), strongly suggests that Congress intended damages to be an available remedy in the courts. *See Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) (where federal statute provides cause of action for protection of legal rights, courts may use all means available to remedy the wrong). The Court of Appeals for the Eighth Circuit has reached a similar conclusion in *Miener v. Missouri,* 673 F.2d 969 at 979–81 (8th Cir.1982), and this Court concurs in that opinion's reasoning on this issue. Because the SFUSD's conduct in this case violated Douglas and Christopher's rights under the Rehabilitation Act as well as the EHA, damages are available under either statute.

Finally, plaintiffs have asserted a claim for damages under 42 U.S.C. § 1983. The judicial thicket is particularly dense in this area, and the courts have been unable to reach any consensus over whether violations of the EHA and the Rehabilitation Act are cognizable under § 1983. *See, e.g., Anderson v. Thompson, supra* note 43, 658 F.2d at 1214–17 (no remedy under § 1983 for EHA claims); *Pushkin v. Regents of the University of Colorado,* 658 F.2d 1372 (10th Cir.1981) (§ 1983 provides remedy for violation of Rehabilitation Act without requiring exhaustion of administrative remedies); *Tatro v. Texas,* 516 F.Supp. 968, 984 (N.D.Tex. 1981) (§ 1983 provides remedy if exhaustion of remedies is required); *Medley v. Ginsberg,* 492 F.Supp. 1294, 1305 (S.D.W.Va.1980) (§ 1983 claim exists for violation of either EHA or Rehabilitation Act). In light of the Court's determination that damages are available in this case under either the EHA or the Rehabilitation Act, however, it is unnecessary for this Court to wrestle with this problem.