Frank BOXALL et al., Plaintiffs,

v.

SEQUOIA UNION HIGH SCHOOL DISTRICT et al., Defendants.

No. C–78–1588 RFP.

United States District Court, N. D. California.

Jan. 9, 1979.

Alice Schaffer Smith, Palo Alto, Cal., for plaintiffs Frank Boxall, et al.

Thomas A. Branson, Branson, Fitzgerald & Howard, Redwood City, Cal., for defendant Sequoia Union High School District.

George Camerlengo, Deputy Dist. Atty., County of San Mateo, Redwood City, Cal., for defendant San Mateo County.

John L. Hartman, San Francisco, Cal., for defendant San Mateo Office of Education.

Charlton G. Holland, III, Winifred Younge Smith, Deputy Attys. Gen., San Francisco, Cal., for defendant State of California.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

This action was brought by David Boxall, a sixteen year old autistic child, and his father, Frank Boxall, seeking injunctive relief and damages for the alleged failure of defendant Sequoia Union High School District ("the District") to provide David with a "free, public education appropriate to his needs." Defendants are the District, the State of California ("the State"), San Mateo County ("the County"), and individuals representing those institutions, and it is alleged that their refusal to pay for a full-time private tutor for David in the home of the Boxalls violated the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Rehabilitation Act of 1973, § 504, 29 U.S.C. § 794; and the Education for All Handicapped Act of 1975, 20 U.S.C. §§ 1401–1420, amending 20 U.S.C. §§ 1401–1461. Pendent claims based on California statutory and constitutional law are also made.

The complaint was filed on July 18, 1978. The State and District answered, while the County moved to dismiss under Federal Rule 12(b) and for a more definite statement under Federal Rule 12(e). Although, as explained below, the motion to dismiss raises some novel issues in the developing law of the handicapped, both of the motions must be denied.

## FACTUAL ALLEGATIONS

The complaint alleges that David Boxall was ready to enter high school on September 13, 1976.[1] Prior to that date, on June 8, 1976, the District Admissions and Discharge Committee of the Sequoia Union High School District met to consider him for admission to programs of that school. Frank Boxall was not informed about the meeting or of his right to appear. At the meeting

---

1. This evidently meant that he came under the jurisdiction of the Sequoia Union High School District, rather than the Las Lomitas School District, which previously had dealt with him.

the District Committee agreed that David suffered from autism and that there was no program within the District that would be appropriate for him. Accordingly, his situation was referred to the County Autistic Program, operated by the County under contract to the District. The County Admission and Discharge Committee, however, felt that the County program was also inappropriate because, in their opinion, David Boxall needed a one-to-one relationship with a teacher because of the nature of his autistic condition.

Frank Boxall met with District personnel on September 17, 1976, and was told that a State consultant rejected the County findings and suggested that David Boxall be observed within the County Autistic Program before assuming that the County program was inappropriate. Dr. Boxall, claiming that such an experiment would cause severe damage to David, refused to permit him to be placed in the County program. On October 26, 1976, the Committee decided to make no recommendation until David was observed in the County program or until a new report was obtained from a school psychologist or other relevant agency.

A District psychologist, at the request of the County, then evaluated David on January 11, 1977, concluding that David needed a "one-to-one, highly individualized program." This recommendation was never acted upon.

On October 10, 1977, early in the next school year, Frank Boxall requested a hearing pursuant to regulations issued under the Education for the Handicapped Act and now contained at 45 C.F.R. § 121a.506. The Fair Hearing Panel met on January 11, 1978, and determined that an independent agency should develop an "individualized education program" (I.E.P.) for David, and on May 1, 1978, the Golden Gate Regional Center made such an assessment, agreeing with David's father and the previous assessment of David's educational needs. The District Admission and Discharge Committee accepted the I.E.P., but it did not implement the recommendation while it appealed the Fair Hearing Panel's decision. It offered instead to provide a home tutor for one hour a day, as opposed to the recommended six hours per day. The offer was refused, and David Boxall therefore received no aid from the State, District, or County for the academic years 1976–77 and 1977–78.

During that time, however, Frank Boxall retained a tutor at his own expense, and plaintiffs are now seeking reimbursement for expenditures involved in securing the tutor. On May 9, 1978, Dr. Boxall requested a Fair Hearing on the issue of his damages for securing the private tutor. The Hearing Panel met on June 23, 1978 and reached a decision on July 2, 1978. Plaintiff appealed the decision, and an appellate hearing was held on August 29, 1978. Although the time period for ruling on the appeal had passed as of at least October 6, no ruling has been made.

## APPLICABLE FEDERAL LAW

Federal courts began to recognize the rights of the handicapped persons in education in the early 1970's. *See, e. g., Mills v. Board of Education of the District of Columbia,* 348 F.Supp. 866 (D.D.C.1972) (due process and equal protection rights of emotionally disturbed to appropriate education), *Pennsylvania Association for Retarded Children v. Pennsylvania,* 343 F.Supp. 279 (E.D. Pa.1972), *modifying* 334 F.Supp. 1257 (three-judge panel) (consent decree entered on due process and equal protection claims), *New York Association for Retarded Children v. Rockefeller,* 357 F.Supp. 752 (E.D.N. Y.1973); *Harrison v. Michigan,* 350 F.Supp. 846 (E.D.Mich.1972); *Kruse v. Campbell,* 431 F.Supp. 180 (E.D.Va.1977) (three-judge panel), *judgment vacated and remanded sub nom. Campbell v. Kruse,* 434 U.S. 808, 98 S.Ct. 38, 54 L.Ed.2d 65 (1977).

Since the Supreme Court's decision in *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the equal protection standard of review in education cases has been clarified, and accordingly some of the specific holdings on that basis are now questionable. Indeed,

the equal protection decision in *Campbell v. Kruse, supra,* was vacated by the Supreme Court and remanded with instructions to resolve the case according to recent federal statutes, *see also, e. g., Cuyahoga County Association for Retarded Children, Etc. v. Essex,* 411 F.Supp. 46 (N.D.Ohio 1976).

■ The conscience of Congress, however, responded to the problems of the handicapped which had led to the constitutional decisions. Federal statutory reforms have now gone as far or even farther than the constitutionally based decisions of the early 1970's. Congress responded in particular with the Rehabilitation Act of 1973. 29 U.S.C. § 701 *et seq.* Section 504 of the Act, 29 U.S.C. § 794, provides as follows:

No otherwise qualified handicapped individual in the United States, as defined in section 706(6) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

This is analogous to the rights of minorities under Title VI of the Civil Rights Act of 1964.[2] In addition, the Education of the Handicapped Act of 1975, 20 U.S.C. § 1401 *et seq.,* establishes a strict set of conditions under which states can obtain federal assistance for funding made available for programs for the handicapped. Detailed regulations have also been issued by the Secretary of Health, Education, and Welfare under both new laws. 45 C.F.R. Pt. 84; 45 C.F.R. Pt. 121a.[3]

With the enactment of these laws and regulations, the handicapped have been provided with a formidable array of federal rights, both procedural and substantive. There are some differences in the coverage of the various statutes,[4] but the general purposes are the same. With respect to education, according to the Secretary of Health, Education, and Welfare,

The basic requirements . . . are (1) that handicapped persons, regardless of the nature or severity of their handicap, be provided a free appropriate public education, (2) that handicapped students be educated with nonhandicapped students to the maximum extent appropriate to their needs, (3) that educational agencies undertake to identify and locate all unserved handicapped children, (4) that evaluation procedures be improved in order to avoid the inappropriate education that results from the misclassification of students, and (5) that procedural safeguard be established to enable parents and guardians to influence decisions re-

---

2. Section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides:

No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participat[ing] in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

As noted in *Lloyd v. Regional Transportation Authority,* 548 F.2d 1277, 1280 n.9 (7th Cir. 1977), "Section 504 had its genesis in an abortive attempt by Congressman Vanic to include the handicapped within the strictures of the Civil Rights Act of 1964 itself."

3. The regulations under the Rehabilitation Act of 1973 became effective on June 3, 1977. A lawsuit was required to compel their issuance. *See Cherry v. Mathews,* 419 F.Supp. 922 (D.D. C.1976). The regulations under the Education of the Handicapped Act became effective on October 1, 1977. The Rehabilitation Act regulations now in effect can be applied to conduct prior to their effective date, given that they merely interpret the statutes. *See, e. g., Davis v. Southeastern Community College,* 574 F.2d

1158, 1161 (4th Cir. 1978) (with supporting authorities).

4. The differences are discussed in some detail in the comments of the Secretary at 45 C.F.R. Pt. 121a, App. A at 500–01. The following difference appears to be the most significant:

It should be noted that the term "free appropriate public education" (FAPE) has different meanings under Part B and section 504. For example, under Part B, "FAPE" is a statutory term which requires special education and related services to be provided in accordance with an individualized education program. However, under section 504, each recipient must provide an education which includes "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met . . ."

*Id.* at 500.

garding the evaluation and placement of their children.

45 C.F.R. Pt. 84, App. A at 384 (1977).

It is evident that the allegations of plaintiffs touch on new and potentially very important federal rights. They contend that they were deprived of a hearing prior to the refusal to grant David Boxall a free appropriate public education, and they contend that, if the right to an appropriate education is to be meaningful, it must encompass—even at considerable expense—the provision of a full-time tutor in the home of an autistic child who cannot fit into another educational setting. Clearly such a situation is within the scope of the statutory scheme. Nevertheless, defendant contends that this right cannot be pursued in this forum at this time. The contention is mistaken, as can be shown by an examination of the arguments propounded in favor of the motion to dismiss.

## MOTION TO DISMISS

I. *The Private Right of Action Under Section 504 of the Rehabilitation Act of 1973*

 Defendant's basic contention appears to be that the conduct of defendants cannot be challenged by a private action under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. This argument is plainly mistaken.

Under prevailing authority, a private right of action does exist to enforce the provisions of section 504 and the regulations issued thereunder. All the circuit courts that have ruled on the issue have found such a right. *See Lloyd v. Regional Transportation Authority,* 548 F.2d 1277 (7th Cir. 1977) (class action by mobility-disabled persons seeking to make public transportation accessible to them); *Leary v. Crapsey,* 566 F.2d 863, 865 (2d Cir. 1977) (private action by mobility handicapped class); *Davis v. Southeastern Community College,* 574 F.2d 1158, 1159 (4th Cir. 1978) (deaf individual challenging denial of admission to nursing school); *United Handicapped Federation v. Andre,* 558 F.2d 413 (8th Cir. 1977) (class action by mobility handicapped).

Further, as pointed out by the Seventh Circuit's carefully-reasoned opinion in *Lloyd, supra,* both the legislative history of the Rehabilitation Act [5] and the analogy to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, as impliedly interpreted in *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), support the existence of such a right. Indeed, the argument for a private right under section 504 is probably even stronger than that under Title VI, given the suggestion by four members of the Supreme Court recently that the right under Title VI may still not be firmly established. *See Regents of the University of California v. Bakke,* 438 U.S. 265, 279–284, 98 S.Ct. 2733, 2743–2745, 57 L.Ed.2d 750, 765–67 (1978). As the Seventh Circuit explained in *Lloyd,* 548 F.2d at 1285–86, Congress enacted the Rehabilitation Act Amendments of 1974 under the clear impression that the wording therein would, consistent with *Lau v. Nichols,* which had just been decided, "permit a judicial remedy through a private action." [6] In other words, the language in the 1974 amendments was chosen partly because it was believed that it would create a private right

---

5. The *Lloyd* court noted that, while the 1973 legislative history did not provide much illumination on the question of a private right of action, the history of the Rehabilitation Act Amendments of 1974 can be used to interpret section 504.

6. The full quotation, from the Senate Report (Labor and Public Welfare Committee) No. 93–1297, November 26, 1974, reads as follows:
This approach to implementation of Section 504 which closely follows the models of the above-cited anti-discrimination provisions [Section 601 of the Civil Rights Act of 1964, 42 U.S.C. 2000d, and Section 903 of the Education Amendments of 1972, 20 U.S.C. 1683], would ensure administrative due process (right to hearing, right to review) provide for administrative consistency within the Federal government as well as relative ease of implementation, and permit a judicial remedy through a private action.
120 Cong.Rec. 30534 (1974), reprinted in [1974] U.S.Code Cong. & Admin.News, pp. 6373, 6391.

of action to enforce the rights created by the statute.[7]

If a private right is recognized, then it must be available to review questions of what constitutes an ."appropriate" education and whether the educational services and facilities offered are "comparable to the other facilities, services, and activities provided for the non-handicapped." 45 C.F.R. § 84.34(c). The conduct that plaintiffs complain about is thus subject to judicial scrutiny through a private action.

■ A further issue, however, is whether plaintiffs pursued their administrative remedies prior to seeking judicial review. There is strong authority conditioning the right to proceed in a private action on the exhaustion of administrative remedies. At the time that *Lloyd* was decided, for example, no procedures for administrative review had been established. The court noted that, had such procedures been established, it would have required their exhaustion prior to allowing the private action under the Rehabilitation Act of 1973. *Lloyd v. Regional Transportation Authority,* 548 F.2d at 1286 n.29. Similarly, at the time a private right of action under Title VI was impliedly recognized in *Lau v. Nichols,* no administrative machinery had yet been established. Such machinery has now been created, applicable to both the Rehabilitation Act and Title VI. *See* 45 C.F.R. §§ 80.6–80.10, 45 C.F.R. Pt. 81, made applicable to the Rehabilitation Act by 45 C.F.R. § 84.61. Many lower courts have accordingly began generally to require exhaustion of these administrative remedies prior to the initiation of a lawsuit.

According to a North Carolina District Court in a Rehabilitation Act proceeding, for example,

> [B]y requiring initial referral of this matter to HEW, the Court preserves the administrative machinery created to effectuate the Rehabilitation Act. Enforcement of the Act is enhanced in that relief

might encompass whole institutions rather than a single individual. Moreover, to the extent the administrative agency resolves the issues, court resources are conserved.

*Crawford v. University of North Carolina,* 440 F.Supp. 1047, 1057 (M.D.N.C.1977) (staying the action under the primary jurisdiction doctrine and requiring plaintiff to file a complaint with HEW). *See also, e. g., NAACP v. Wilmington Medical Center, Inc.,* 426 F.Supp. 919, 924 (D.Del.1977) (ordering Secretary of Health, Education, and Welfare to consider whether construction of a hospital would discriminate against minorities or the handicapped in violation of Title VI or § 504 of the Rehabilitation Act); *Doe v. New York University,* 442 F.Supp. 522 (S.D.N.Y.1978) (requiring exhaustion under § 504).

As these cases suggest, it is appropriate in the normal course of events to require the exhaustion of administrative remedies before pursuing a private action under Title VI of the Civil Rights Act of 1964 or its analogue involved here—section 504 of the Rehabilitation Act of 1973. It is clear that plaintiffs in this case did not file a complaint with HEW and invoke the remedies in 45 C.F.R. §§ 80.6–80.10 and Pt. 81. We are not, however, concerned only with the Rehabilitation Act procedures. The case was also brought pursuant to the statutory scheme created by the Education of the Handicapped Act of 1975, which has its own administrative machinery. 45 C.F.R. Pt. 121a. As discussed below, exhaustion of that machinery may serve to comply with both the provisions of that act and section 504 of the Rehabilitation Act.

II. *The Private Right of Action Under Section 615 of the Education of the Handicapped Act of 1975, 20 U.S.C. § 1415*

■ There is a significant overlap between the Rehabilitation Act of 1973, as

---

7. The same language, as noted in *Drennon v. Philadelphia General Hospital,* 428 F.Supp. 809, 815 (E.D.Pa.1977), "indicates that Congress did not view administrative remedies as exclusive avenues for relief. Therefore, causes of action under the 14th Amendment and 42 U.S.C.

§ 1983 are not contra-indicated." A recent decision by the Ninth Circuit, *De La Cruz v. Tormey,* 582 F.2d 45, 60 (9th Cir. 1978), suggests that § 1983 actions are available to enforce federal statutory rights even if otherwise there could be no private action.

applicable to educational programs receiving federal assistance, and the Education of the Handicapped Act of 1975, which conditions the receipt of funds made available under the 1975 Act. It is undisputed at this point that defendants' conduct is covered by both statutes. Plaintiffs allege that the right to a "free, appropriate" education was denied in violation of both laws.

Plaintiffs clearly have complied with the administrative requirements for review under 20 U.S.C. § 1415. Plaintiffs made administrative claims on the basis of the denial of an appropriate education and on the basis that they were entitled to compensation for expenses in hiring a private tutor for David Boxall. Both claims were pursued through the administrative machinery set up by HEW regulations published at 45 C.F.R. §§ 121a.510–512. Plaintiffs requested a Fair Hearing pursuant to 45 C.F.R. § 121a.506, a Fair Hearing Panel met and each decision was appealed to and decided by State appeals officers.[8] According to 20 U.S.C. § 1415(e), there is a right to sue in the federal district courts to review adverse determinations resulting from the hearing process.

The question then is whether plaintiffs needed to exhaust *both* these administrative remedies and the remedies provided under the Rehabilitation Act. Plaintiffs note that under the regulations published at 45 C.F.R. § 84.36, compliance with the safeguards of 20 U.S.C. § 1415 is sufficient to meet the procedural safeguards implicit in section 504 of the Rehabilitation Act. Although this provision goes to the adequacy of state procedures rather than the issue of what procedures the plaintiffs must invoke, it does illustrate the close connection between the two statutory schemes. Given this close interrelationship, already discussed, it is simply unrealistic to expect persons to proceed through the Rehabilitation Act machinery to enforce a right that stems from both sources. Admittedly, there is a difference between the two types of administra-

tive remedies, since invoking the Title VI Rehabilitation Act machinery may lead to a federal investigation of the recipient of federal funds. But an individual challenge to a determination affecting only *his* education would not gain much from such an investigation. Indeed, the Secretary of HEW has made the following comment:

> It is not the intention of the Department, except in extraordinary circumstances, to review the result of individual placement and other educational decisions, so long as the school district complies with the "process" requirements of this subpart (concerning identification and location, evaluation, and due process procedures).

45 C.F.R. Pt. 84, App. 1 at 384. It must be assumed that an aggrieved individual seeking to enforce the right to an education provided by recent federal statutory developments need not do more than exhaust the administrative remedies created under the authority of the Education of the Handicapped Act. Plaintiffs therefore have complied with all the prerequisites for their private action to review the decision of defendants not to provide a private, full-time tutor for David.

### III. *Compensation for Damages Under Federal Law*

It is established that plaintiffs can pursue injunctive relief through a private action, but they also seek to recover the expenses and other damages incurred over a two-year period in providing a full-time tutor in the home of the Boxalls. There is very little authority on this issue. Only two cases under section 504 of the Rehabilitation Act even touch on the question. In one of them, *Davis v. Southeastern Community College*, 574 F.2d 1158, 1162 (4th Cir. 1978), the court simply noted that the issue had been raised by lower court but was not before the reviewing court. And in the other, *Halderman v. Pennhurst State School and Hospital*, 446 F.Supp. 1295 (E.D.Pa.

---

**8.** The second hearing was held on August 29, 1978, and the hearing officer did not comply with regulations requiring a decision within a 30-day period in the absence of an extension requested by one of the parties. 45 C.F.R. § 121a.512(b), (c). Plaintiffs may thus assume that their appeal was denied in order to pursue this action.

1977), the court found a violation of the Rehabilitation Act but declined to award damages for harm caused by inadequate care because the defendants were acting in "good faith." *Id.* at 1324.

The authority applicable to private suits under Title VI of the Civil Rights Act of 1964 is also inconclusive. The appellate decisions recognizing the private right of action have involved injunctive relief. *See, e. g., Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Bossier Parish School Board v. Lemon,* 370 F.2d 847 (5th Cir. 1967), *cert. denied,* 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967); *Serna v. Portales,* 499 F.2d 1147 (10th Cir. 1974). The Eighth Circuit indicated some doubt as to whether a money judgment could be obtained under Title VI. *Chambers v. Omaha Public School District,* 536 F.2d 222, 225 n.2 (8th Cir. 1976). And the four judges in *Bakke* who expressly recognized a private right of action under Title VI did so only for declaratory and injunctive relief. *University of California Regents v. Bakke,* 438 U.S. at 418–421, 98 S.Ct. at 2814, 2815, 57 L.Ed.2d at 852–53. There are strong reasons for such a limitation, applicable to Title VI and the Rehabilitation Act of 1973.[9]

■ Both Title VI and section 504 of the Rehabilitation Act were enacted to ensure that recipients of public funds do not discriminate against certain protected groups, and both set up an elaborate administrative structure for *governmental* enforcement of the statutory mandate. Neither law, in contrast to Title VII of the Civil Rights Act of 1964, purported to give *individuals* a whole panoply of new rights and remedies. Even under Title VII, it might be noted, Congress chose not to provide a right to compensatory damages beyond back pay. Title VI and the Rehabilitation Act should probably be seen as creating a private supplement to governmental enforcement, not as providing a new entitlement to damages.

■ This does not mean, however, that plaintiffs' action for damages must be dismissed. First, the Education of the Handicapped Act again provides its own complementary remedies. As noted before, it expressly contemplates a private right of action to review the decision on what constitutes an appropriate education for a handicapped person. It is not completely clear from the wording of the statute whether it implies an action for damages. Section 615(e)(2) of the Act, 20 U.S.C. § 1415(e)(2) simply gives aggrieved individuals the right to bring a civil action. *See also* 45 C.F.R. § 121a.511. Some light is shed, however, by the available legislative history of this right to review, which was adopted initially by the Conference Committee. It was not originally part of the Senate bill, and the House provision was also somewhat different. The Committee Report indicates that no limitation on damages actions was intended. It states that:

Such action may be brought in any State court of competent jurisdiction or in any district court of the United States and in any such action the court shall receive the records of the due process hearing (and where appropriate the records of the review of such hearings), shall hear additional evidence at the request of any party, shall make an independent decision based on the preponderance of the evidence, and *shall grant all appropriate relief.* [Emphasis added.]

Joint Explanatory Statement of the Committee of Conference, in Senate Conference Report No. 94–455, p. 50, *reprinted* in [1975] U.S.Code Cong. and Admin.News, pp. 1425, 1503. This statement suggests very strongly that, when appropriate, compensatory damages may be awarded. Since this action is under the Education of the Handicapped Act as well as the Rehabilitation Act, the court does have the authority to award damages.

Since the Education of the Handicapped Act became effective only in October 1977, there is a remaining question as to whether damages can be sought for the actions ex-

---

9. This limitation would not necessarily apply where a section 1983 claim could also be maintained.

tending from September 1976 to that date.[10] That question need not be resolved at this stage of the litigation, because plaintiffs also seek damages under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment and the Rehabilitation Act. It may be that the section 1983 action for damages will require a different standard of proof before damages can be awarded, but that issue is not yet before this court.

■ Defendant attempts to challenge the section 1983 claim on the basis that plaintiffs fail to allege a constitutional violation. Plaintiffs, however, do allege violations of the Fourteenth Amendment due process clause because of a failure to provide notice and a hearing prior to the decision in 1976 to change David's educational situation. Moreover, defendant has misunderstood section 1983. It reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution *and laws,* shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. [Emphasis added.]

It is clear that plaintiff can generally sue to enforce federal statutory rights as well as constitutional rights. *Cf. De La Cruz v. Tormey,* 582 F.2d 45, 59–61 (9th Cir. 1978) (finding a § 1983 claim to enforce Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, even though there might be no private right in the absence of state action); *Cannon v. University of Chicago,* 559 F.2d 1063 (7th Cir. 1977).

Plaintiffs' federal claims, including that for damages, are properly before this court. In view of their pleadings under the Rehabilitation Act of 1973, the Education of the Handicapped Act of 1975, and the Civil Rights Act of 1871, 42 U.S.C. § 1983, plaintiffs' allegations are not vulnerable on the grounds raised by defendant's motion to dismiss.

**IV.** *Compliance with the California Tort Claims Act*

■ Defendant's final argument for dismissal of certain claims is that pendent California counts against the County are barred because plaintiffs failed to file a claim for damages against the County prior to the institution of the lawsuit. Cal. Government Code §§ 905, 911.2 require that all such claims be presented to the county within 100 days of the accrual of the cause of action. While such filing is not a requisite to *federal* claims, it is well established that federal courts will not enforce pendent state claims in the absence of compliance with such state provisions. *See, e. g., Willis v. Reddin,* 418 F.2d 702 (9th Cir. 1968).

As plaintiffs point out, however, Cal. Government Code § 895.2 provides as follows:

> Whenever any public entities enter into an agreement, they are jointly and severally liable upon any liability which is imposed by any law other than this chapter upon any one of the entities . . . . .
>
> Notwithstanding any other laws, if a judgment is recovered against a public entity for injury caused in the performance of an agreement, the time within which a claim for such injury may be presented or an action commenced against any other public entity that is subject to the liability determined by the judgment under the provisions of the section begins to run when the judgment is rendered.

Since plaintiffs allege that the County's liability stems from its contractual relations with the District, it would appear that plaintiffs can take advantage of this provision. Defendant, in addition, was unable to cite any authority or make any serious arguments as to why this provision would not apply, and therefore the claim for damages against the County under pendent state claims will not be dismissed.

### MOTION FOR A MORE DEFINITE STATEMENT

■ The motion for a more definite statement can be denied with little discus-

---

10. *Cf. Eberle v. Board of Public Education,* 444 F.Supp. 41, 44 (D.Pa.1977).

sion. While defendant may not have been able to ascertain all the details of plaintiffs' case from the complaint, that is not the function of pleadings in the federal courts. According to Federal Rule 12(e), a motion for a more definite statement should not be granted unless defendant cannot "frame a responsive pleading." That is certainly not the case here.

## CONCLUSION

Defendant's motion to dismiss touches on a number of important points of law, but ultimately the motion must be found wanting. It may be that actions by mentally handicapped persons such as David Boxall could place a significant burden on the resources of our public school systems, but Congress has determined that it is worth the price to develop the potential of the handicapped and has even allocated substantial amounts of funds to aid in this national effort. Plaintiffs' private effort to enforce these new rights cannot consistent with Congressional purpose be stopped by a motion to dismiss.

Defendant's motions to dismiss and for a more definite statement are denied.

IT IS SO ORDERED.