George HURRY and Maureen Hurry,
Parents, Guardians, and Next
Friends of George Hurry

v.

Dr. Jerome B. JONES, Superintendent of Schools, Providence; James Healy, Supervisor of Public Transportation, Providence; Josephine DiRuzzo, Patrick O'Ragan, Mary Ross, Roberto Gonzalez, Diane Brosofski, Vincent DiNicola, and Joseph Duffy, Members of the Providence School Committee; Bernice Graser, John McKenna, Individually and in their official capacities.

Civ. A. No. 78–0714.

United States District Court,
D. Rhode Island.

March 24, 1983.

502

Thomas A. Tarro, III, Providence, R.I., for plaintiffs.

Vincent J. Piccirilli, Providence, R.I., for defendants.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

This is a civil action in which plaintiffs seek reimbursement, money damages, costs, and attorneys fees for alleged violations of the Fifth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983, the Education for All Handicapped Children Act of 1975, and the Rehabilitation Act of 1973. Jurisdiction is asserted under 28 U.S.C. §§ 1331, 1343, 2201, 2202, and 42 U.S.C. § 1983. In addition, Plaintiffs have urged this Court to exercise pendent jurisdiction over a related state claim based on violations of Article 12, Section 1 of the Constitution of the State of Rhode Island, R.I.Gen.Laws §§ 16–24–1, –4, –11, and applicable regulations promulgated under these statutes.

Plaintiffs are George and Maureen Hurry, the parents and next friends of George Hurry, a minor. Defendants are Dr. Jerome B. Jones, Superintendent of Schools for the City of Providence; James Healy, Supervisor of Public Transportation for the City of Providence; Josephine DiRuzzo, Mary Ross, Patrick O'Ragan, Roberto Gonzalez, Diane Brosofski, Vincent DiNicola, and Joseph Duffy, as Members of the Providence School Committee; John McKenna, Segment Administrator for Special Education of the Providence School Department and Bernice Graser, his Administrative Assistant.

George Hurry [hereinafter George] is a physically and mentally handicapped child as defined by both federal and state law. George has cerebral palsy, evidence of spastic quadriplegia, and a degree of mental retardation. He is confined to a wheelchair, and according to medical testimony will never be ambulatory. He will probably need some physical therapy for the rest of his life due to his spastic muscle condition, and he needs occupational therapy in order to develop self-help skills in activities of daily living.

George was born on October 21, 1966. From the time he was three to four years old to the present, he has been placed in various special education programs at Pleasant View School, Meeting Street School, Cranston Center for the Retarded, and The Learning Center, Inc. Prior to January of 1976, the City of Providence provided assistance to George from the entrance of his home to the school bus, and

transportation to and from school. Bus drivers for the school department would carry George from the front door of his home down approximately twelve steps to the street level and into the bus. By January of 1976, however, George had gained weight and was so heavy (160 lbs.) that the bus drivers would no longer carry him. In addition to the child being overweight, the concrete steps were steep and cracked in some places, making it somewhat unsafe for anyone to attempt to carry George down to the street. As a result, Mr. and Mrs. Hurry made what arrangements they could in order to transport George to school in 1976 and 1977. Mr. Hurry, who was attending college until April of 1976, would carry George from their home to his van at approximately 7:30 every morning. Mr. or Mrs. Hurry would then drive George to school. At the end of each school day, the Hurrys would return to the school, bring George home, and lift him out of the van and up the stairs to the house.

In June of 1976, Mr. Hurry was able to find employment, which required that he work from approximately 7:30 a.m. to 5:15 p.m. each day. This change in circumstances caused further complications with George's transportation to and from school. Mrs. Hurry could not lift George in and out of the van without assistance. According to the Hurrys' testimony at trial, someone on the school premises helped lift George in and out of the van before and after his classes. In the afternoons, however, George and his mother would drive to Mr. Hurry's place of employment, where they had to wait several hours until he could leave work. They would then drive home together where Mr. Hurry would lift George out of the van and up the stairs. During the summer and winter months, George frequently did not attend school because it was either too hot or too cold for him to wait in the van for his father each afternoon.

In December of 1977, Mr. and Mrs. Hurry stopped transporting George to school altogether. They testified that George began to complain of pain in his legs as a result of sitting in the van every afternoon. In addi-

tion, he started crying in the van, and having difficulty sleeping at night.

The Hurrys testified that they began calling the Providence School Department in 1976, and had numerous conversations with Defendants John McKenna and Bernice Graser of the Special Education Department in an effort to resolve George's transportation problem. In a memorandum to Mr. McKenna dated September 14, 1978, Ms. Graser acknowledged that she had been aware of the situation for over a year and that the Hurrys had been very patient with the school department until then. She described her efforts to involve community agencies and the Mayor's office in constructing a wheelchair ramp for George, and indicated that the Rhode Island Protection and Advocacy System [hereinafter RIPAS] had become involved in trying to help the Hurrys.

Although there was much discussion, a wheelchair ramp for George was not constructed by the Mayor's office allegedly due to a number of liens on the Hurry property. Attorneys from RIPAS had by now embarked upon a course of conferences and correspondence with the Providence School Department. On September 15, 1978, RIPAS Legal Assistant David Allen requested a hearing from the School Department. The School Department did not respond to this request within the statutory time limit, and this lawsuit was filed by RIPAS on behalf of the Hurrys and their son George on December 19, 1978. At that time, George had not been to school for more than a year.

Due to a number of problems, and allegedly the liens on the Hurry property, the wheelchair ramp was not built. RIPAS, the Hurrys, and the School Department developed a mutually acceptable alternative plan, however, and as of October 29, 1979 this claim was resolved as to the Plaintiffs' claim for injunctive relief. George returned to school pursuant to an Individual Educational Program developed for him by the Special Education Department of the Providence Public Schools on May 2, 1979.

On November 15, 1979, the Hurrys' family attorney entered an appearance in the case, and on November 26, 1979, RIPAS withdrew as named Plaintiff in the action. In light of the intransigent manner in which the Providence School Department mishandled George's transportation problem, and the fact that George did not attend school at all from January of 1978 to June of 1979, the Hurrys have pursued their claim for damages for the period of time from September, 1977 through June, 1979. They base their claim for damages on 20 U.S.C. § 1415(e)(2) (1976), 29 U.S.C. § 794 (Supp. V 1981), 42 U.S.C. § 1983 (1976), the Fifth and Fourteenth Amendments of the United States Constitution, Section 1 of Article 12 of the Constitution of Rhode Island, and Title 16, Chapter 24 of the General Laws of Rhode Island.

Plaintiffs claimed damages under the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6001–6081 (1976) claiming generally that the Defendants had violated George's rights under the Act. Plaintiffs did not allege any specific violation of the Act in either their pre-trial or post-trial memorandum of law, and they now concede that damages are not recoverable under the Developmentally Disabled Assistance and Bill of Rights Act in light of the decision of the Supreme Court in *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), and the United States District Court, District of New Hampshire, in *Garrity v. Gallen,* 522 F.Supp. 171 (D.N.H.1981).

Next, Plaintiffs seek damages pursuant to the Education for All Handicapped Children Act [EAHCA], which provides that in order for a State to qualify for assistance under the Act, "a State shall demonstrate to the Commissioner that ... [t]he State has in effect a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). Plaintiffs contend that George was deprived of a free appropriate education as guaranteed by the special education laws because the Providence School Department did not provide transportation to and from school for George from January of 1976 to June of 1979. Clearly, Plaintiffs' contentions are supported by the evidence. The Defendants completely failed to carry out their unambiguous responsibilities to George under state and federal law. The significant issue is whether § 1415(e)(2) of the EAHCA, which authorizes the court to "grant such relief as ... is appropriate," entitles Plaintiffs to damages for personal suffering, and reimbursement for the costs his parents incurred in transporting George to and from school.[1]

■ In order to maintain a claim under the EAHCA, Plaintiffs must first establish that they have exhausted the administrative remedies created under the Act or that exhaustion would have been futile, wasteful of resources, harmful to the litigants, or that the controversy involved purely a matter of law. *Ezratty v. Puerto Rico,* 648 F.2d 770, 774 (1st Cir.1981).

In this action, exhaustion of administrative remedies would have been futile. Plaintiffs requested help from the Providence School Department on many occasions. The requests were met with inaction. The refusal to assist George from the door of his home to the bus effectively changed George's educational placement and the school authorities should have *sua sponte* provided notice to the Hurrys, including a full explanation of all procedural safeguards available to them, at that time. Education for Handicapped Children, Regulations of Rhode Island Board of Regents for Education (Effective, October 1, 1977,) § IX, Subsections 4.1, 4.1.1, 5.1, 5.1.1. George was literally and effectively barred from school by the School Department's inaction. Moreover, on September 15, 1978, the Rhode Island Protection and Advocacy System requested a hearing on behalf of the Hurrys pursuant to § IX, Subsection 6.1.1 of the State Board of Regents Regulations Governing the Special Education of Handicapped Children. Defendants did not

---

1. There is no evidence which would support a claim for loss of education, as such, and therefore no claim for what has been called "educational malpractice."

respond to the latter request within forty-five calendar days after the request was made, as required by the regulation, and on November 7, 1978, RIPAS requested an evidentiary hearing before the Commissioner of Education pursuant to § IX, 9.1 and 9.1.3 of the regulations.

On November 10, 1978, Defendant Jerome B. Jones, Superintendent of Schools, wrote to RIPAS Legal Assistant David Allen, informing him that the Providence School Department would provide home instruction for George Hurry starting immediately. Again, this was a change in educational placement which should have triggered notice, including an explanation that the Hurrys were entitled to a hearing. Education for Handicapped Children, Regulations of Rhode Island Board of Regents for Education (as amended, August 3, 1978), § IX, Subsections 4.1, 4.1.1, 5.1, 5.1.1. Mr. Allen replied on November 15, 1978 by stating RIPAS' position that home instruction would not constitute the least restrictive environment for George in accord with the requirements of EAHCA and again requesting an impartial hearing from the school department pursuant to state regulations. A hearing was not provided at any time. Under these circumstances, no further attempt by Plaintiffs to exhaust their administrative remedies was necessary.

In *Doe v. Anrig,* 692 F.2d 800 (1st Cir. 1982), the First Circuit held that 20 U.S.C. § 1415(e)(2) and related sections of the EAHCA do not generally authorize an award of reimbursement to parents who have successfully challenged a proposed Individualized Education Program under the Act, pointing out that this view is in accord with the present weight of authority. *Id.* at 811–12. This view proceeds on the basis that judgments as to appropriate educational programs are not necessarily exact nor are they capable of a precise measurement in terms of their suitability. It is not suggested, however, that a student who is effectively and unlawfully barred from school does not have a remedy. The First Circuit acknowledged that several district courts have allowed reimbursement claims, noting that the facts of these cases tended to es-

tablish exceptional circumstances. *Id.* at 811. In its analysis, the court discussed *Anderson v. Thompson,* 658 F.2d 1205 (7th Cir.1981), in which the Seventh Circuit suggested two exceptional circumstances which might allow for a limited reimbursement award under § 1415(e)(2). *Id.* As stated in *Anderson,*

"... when a court subsequently determines that the services in dispute were necessary to protect the physical health of the child and also were services that should have been provided by the school district, the district court has the statutory authority to recompense parents for the costs of those services the school district failed to provide.

A second exceptional circumstance would exist when the defendant has acted in bad faith by failing to comply with the procedural provisions of section 615 in an egregious fashion."

*Anderson, supra,* 658 F.2d at 1214. In its holding, the First Circuit indicated that the issue remained open as to whether future plaintiffs might recover upon a showing of exceptional circumstances. *Doe, supra,* 692 F.2d at 812.

Although recompense awards are not generally available under the EAHCA, exceptional circumstances such as those described in *Anderson* do exist in this action. Mr. & Mrs. Hurry provided transportation services for George on their own for two years in order to protect the physical health of George Hurry, and these services should have been provided by the school department under both state and federal law.

Mr. and Mrs. Hurry testified at trial that sitting in the van for so many hours each afternoon was causing George much discomfort and pain. Mr. Hurry testified that the muscle pain became worse, George was often unable to sleep, and did not receive any physical therapy between December of 1977 and June of 1979 when George was not attending school at all. Both Mr. and Mrs. Hurry testified that there was a marked improvement in George's physical and mental health after returning to school in 1979.

Dr. Joseph Brian May, a pediatrician specializing in the treatment of physically and mentally handicapped children, testified that George needed physical therapy on a daily basis, and without it George's bodily and motor functions would be adversely affected. Had the Defendants provided the necessary transportation services for George, it would not have been necessary for him to spend afternoons in the van waiting for his father to take him home, and his physical therapy would have continued uninterrupted.

These services were the responsibility of the school department under both state and federal law. Of course transportation *per se* is not an educational service. It is a "related service" as defined in 20 U.S.C. § 1401(17). Section 1413 of the EAHCA sets out the requirements of state plans for states wishing to receive assistance under the Act for educating the handicapped. Federal law requires that each plan must "provide that programs and procedures will be established to assure that funds received by the State or any of its political subdivisions under any other Federal program, . . . will be utilized . . . only in a manner consistent with the goal of providing a free appropriate public education for all handicapped children, . . . ." 20 U.S.C. § 1413(a)(2). A "free appropriate public education" is defined in § 1401(18) as meaning special education and related services, and "related services" is defined in § 1401(17) as "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a handicapped child to benefit from special education . . . ."

R.I.Gen.Laws § 16–24–4, as amended, provides that "[t]he school committee of each city and town shall provide for the transportation to and from school either within the school district or in another school district of the state for any child who is handicapped in accordance with the regulations of the state board of regents for education." R.I.Gen.Laws § 16–24–11, regarding transportation for retarded children, provides that "[t]ransportation shall be provided for all pupils attending such special class or suitable day schools." More specifically, and with remarkable clarity, Section VII, Subsections 1.0, 2.1, and 2.1.2 of the Regulations of the Rhode Island Board of Regents for the Education for Handicapped Children, describe the responsibilities of the school department:

1.0 *Responsibility*—All handicapped children who need special transportation as a related service and as determined by the evaluation process and described in the I.E.P. shall be provided such service. It shall include free transportation to and from the home (door to door, if necessary) to the educational program in which he/she is enrolled. It shall also include free transportation to and from clinical, diagnostic and therapeutic facilities when the clinical, diagnostic and therapeutic services are necessary either to complete the child's evaluation or to provide the services required by his/her I.E.P.

2.0 Transportation Needs of Handicapped Children

2.1 Handicapped children needing transportation as a "related service" are those children whose mental, emotional or physical handicaps are such that they need this related service to assist them to benefit from special education, that is, they need special transportation to get them to the special education program in order to benefit from it. The determination as to whether their handicapping condition requires this service (special transportation) is made through the evaluative process; the requirement that the service be provided is contained in the child's individual education plan. When such transportation is provided, it must meet the requirements of the Registry of Motor Vehicles for the transportation of school children and the following regulations of the Board of Regents for the Transportation of Handicapped Children.

\* \* \* \* \* \*

2.1.2 A minimum of one aide assigned to each bus. Such aide, in addition to providing general care and supervision of all handicapped children on such bus, shall

also provide assistance (from street level entrance of dwelling) to such children lacking the mobility to leave the home and board transportation vehicles, and shall further assist such children in debarking the vehicle and entering the school. When children are transported to clinical, diagnostic, or therapeutic facilities, determination of whether a bus aide is necessary shall be based on a judgment of the LEA multidisciplinary team.

In spite of the clarity with which the federal and state statutes and regulations set forth the Defendants' responsibility, they failed to solve the problem for an inexcusably long period of time. The Defendants had provided transportation for George until 1976, at which point the school bus drivers would no longer carry George. The Hurrys themselves then assumed the responsibility of getting George to school for two years, at the same time attempting to obtain help and a solution from the school department. They were patient with the school department, but decided that they could not continue transporting George for fear that his physical health was in danger as a result of sitting for such long periods in the van every afternoon.

■ In *Doe v. Anrig,* the First Circuit referred to the *Anderson* court's detailed analysis of the goals of the EAHCA. *Doe, supra,* 692 F.2d at 811. A portion of that analysis bears repeating at this point:

> A damage remedy is not, in our view, generally consistent with the goals of this statute. When a school district makes a good faith effort to provide a child with an appropriate education, we do not believe that as a general rule it is good policy to require that a school district pay money damages if it later turns out that a different programming decision should have been made. Moreover, in as new and undeveloped a field as special education, there is a need for flexibility and experimentation in programming for handicapped children. We take judicial notice of the fact that at the present time, problems of classification and treatment abound. Disagreements will arise

> and errors will be made. In short, we perceive that educational programs for the handicapped will suffer if school officials, for fear of exposing themselves to monetary liability for incorrect placement, hesitate to implement innovative educational reforms.

*Anderson, supra,* 658 F.2d at 1213. Based upon this reasoning, the general rule that damages are not available as a remedy under § 1415(e)(2) is well founded. The dispute between the Hurrys and the Defendants in the instant action, however, did not center on some highly discretionary matter such as programming, classification, or placement. Protecting the school department's need to exercise its good judgment in these difficult areas should not extend to insulating it from liability in a case such as this where the Defendants took approximately three years to meet their indisputable lawful obligation to provide transportation for George Hurry to and from school. In spite of his parents' efforts to obtain the transportation benefits to which George was entitled, school officials ignored their obvious duty. This situation establishes both of the exceptions stated in *Anderson, supra,* 658 F.2d at 1213–14, that (1) George was denied mandated services necessary to protect his physical health, and (2) Defendants' repeated and gross lack of concern must be perceived as a bad faith failure to provide clearly mandated services. "Bad faith" is defined for purposes of awarding attorney's fees as a "showing that a defendant's obstinacy in granting a plaintiff his clear legal rights necessitated resort to legal action with all of the expense and delay entailed in litigation." *Huecker v. Milburn,* 538 F.2d 1241, 1245 n. 9 (6th Cir.1976). In its simplest form, the phrase implies breach of faith, wilful failure to respond to plain, well-understood statutory or contractual obligations. *National Labor Relations Board v. Knoxville Pub. Co.,* 124 F.2d 875, 883 (6th Cir.1942). Under these circumstances, the only appropriate relief is an award of damages compensating them for the alternative transportation services they provided for their son George from January 1976 to December 1977 and an appropriate award of

damages for Defendants' bad faith failure to recognize George's rights.

Based on undisputed evidence presented at trial, Mr. Hurry's costs in transporting George to and from the school were approximately $12.50 per week. In light of the fact that George was severely handicapped, his Individualized Education Program required that he attend school 230 days, or 46 school weeks, per year. Multiplying 46 school weeks by Mr. Hurry's costs of $12.50 per week equals $575. The Hurrys are therefore entitled to be reimbursed $575 for transportation expenses in 1976, and $575 for 1977, making a total of $1,150. Additionally, Plaintiffs are entitled to compensation for their contributed services at the rate of $10 per day, for a total of $4600.

Plaintiffs also seek compensatory damages for George's loss of enjoyment of life, and regression of physical and mental skills. Doubtless George Hurry experienced all of these things. He was the hapless victim under the circumstances of this case. There is no evidence concerning George's loss of mental skills and therefore no need to consider whether such a loss may be considered in an award of damages. Furthermore, loss of educational benefits are not sought, and probably could not be awarded in accord with *Doe v. Anrig, supra,* and the *Anderson* court's well-reasoned analysis of the legislative history and objectives of the Act. *See also Ruth Anne M. v. Alvin Independent School District,* 532 F.Supp. 460, 466, 468 (S.D.Tex.1982) (Congress did not intend to create educational malpractice action; under exceptional circumstances, only appropriate damages recoverable by parents are costs of obtaining services school district was required to provide under EAHCA).

At the very least, however, Defendants should not be rewarded for their failure to provide George with an educational opportunity. The savings which accrued to Defendants are ill-gotten gains which should be denied them. The refusal to provide transportation assistance for George was the equivalent in his circumstances of a change of placement which immediately should have resulted in a hearing under state regulations. Education for Handicapped Children, Regulations of Rhode Island Board of Regents for Education (as amended, June 7, 1979), § IX, Subsection 4.1.1. Because of his parents' efforts, George did attend school in the 1976 and 1977 school years. He did not attend school from January, 1978 to June, 1979. Due to Defendants' persistent indifference, the cost of educating George during this time was avoided. This result is clearly inequitable. Equity requires that George be recompensed the amount Defendants were not required to expend. According to figures provided by the Management and Budget Office of the Rhode Island Department of Elementary and Secondary Education, the average per pupil cost for special education in the City of Providence was $5,722 in 1978, and $6,148 in 1979. The Court judicially notices these facts under the provisions of Rule 201(b)(2), and (c), of the Federal Rules of Evidence. George did not attend school at all in 1978, and he was out of school six months in 1979. Therefore he is awarded the sum of $8,796 ($5,722 for 1978 and $3,074, $6/12$ of $6,148, for 1979).

■ Plaintiffs have also sought compensatory damages under § 504 of the Rehabilitation Act of 1973, 42 U.S.C. § 1983, and the Fifth and Fourteenth Amendments of the United States Constitution. Plaintiffs' claim for damages under the Fifth Amendment must fail. Although Plaintiffs brought this action in part pursuant to the Fifth Amendment, they only mention this claim in passing in an introductory paragraph of their post-trial memorandum. There is no further discussion of a Fifth Amendment violation whatsoever, and the Court must assume that Plaintiffs do not seriously pursue this argument.

■ Plaintiffs' § 1983 claim for damages contains two arguments. First, Plaintiffs contend that the Defendants violated the Equal Protection Clause of the Fourteenth Amendment by failing to provide George Hurry with transportation to school, while providing transportation for nonhandicapped children. In fact, the Defendants' failure was to convey George from his front

door to a school bus. Obviously, nonhandicapped children were not provided such a benefit. There was no discrimination upon which to base this argument and it is without merit.

█ The Plaintiffs' second argument under § 1983 is that the Defendants denied them their right to procedural due process as guaranteed by the EAHCA, and the state regulations promulgated under the Act. The Education for Handicapped Children Regulations of the Rhode Island Board of Regents for Education provide that a parent may initiate a hearing where the State Educational Agency refuses to provide a free appropriate public education to a handicapped child. See Education for Handicapped Children, Regulations of Rhode Island Board of Regents for Education (as amended, June 7, 1979), § IX, Subsections 6.1, 4.1.2. In order to initiate a hearing, however, the parent must file a written complaint with the Superintendent of Schools. Id., Subsection 6.1.1.1. The Plaintiffs alleged in their complaint that they requested such a hearing, and in interrogatories questioned why the Defendants ignored this request. The Defendants answered that neither the Plaintiffs nor their legal representative ever requested a hearing, but that they were provided with information describing procedures to do so, and several formal conferences were held pursuant to the Hurrys' requests. Plaintiffs' Exhibit 14, copy of a letter from a RIPAS attorney to the State Commissioner of Education dated November 7, 1978, and Exhibit 15, a copy of a letter from RIPAS Legal Assistant directed to the Superintendent of Schools dated November 15, 1978, contradict the Defendants' position that no request for a hearing was ever made. The November 7 letter refers to a written request for hearing made on September 15, 1978 to Defendant Bernice Graser, to which the School Department did not respond within forty-five calendar days as required by state regulations, and the November 15 letter is itself another written request for a hearing to be held within ten school days as required by the regulations. The Defendants did not present any evidence to the

contrary, nor did they offer any reasons for not responding to the Plaintiffs' requests. This Court finds that the Plaintiffs were entitled to a hearing, and that by ignoring their requests the Defendants deprived them of their right to procedural due process.

Plaintiffs seek compensatory damages for this violation of their right to procedural due process, alleging that George sustained injury, and that he would not have suffered injury if the Defendants had followed proper procedures. Ordinarily, it would be appropriate at this point to evaluate the Plaintiffs' claim for damages in light of the standards established by the Supreme Court in *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). This Court declines to do so, however, because of its view that under the circumstances in the present case, § 1983 is being used to enforce procedural safeguards guaranteed Plaintiffs only by virtue of the EAHCA, and the present weight of authority holds that the detailed remedial provisions of the Act indicate that a § 1983 action to enforce rights under the EAHCA would be wholly inconsistent with congressional intent. *Anderson, supra,* 658 F.2d at 1214–17; *Davis v. Maine Endwell Central School District,* 542 F.Supp. 1257, 1261–62 (N.D.N.Y.1982); *Turillo v. Tyson,* 535 F.Supp. 577, 581 (D.R.I. 1982). *See generally Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981) ("[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983.").

Plaintiffs also seek money damages for Defendants' alleged violation of § 504 of the Rehabilitation Act of 1973. Section 504 provides, in pertinent part,

No otherwise qualified handicapped individual in the United States, ..., shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794 (Supp. V 1981). Plaintiffs contend that the Defendants' failure to provide transportation for George Hurry for a three and one-half year period was based solely on his handicapped status, and therefore constituted exclusion from and denial of benefits within the meaning of § 504.

■ The First Circuit has not yet decided the issue of whether the Rehabilitation Act authorizes a private cause of action to enforce § 504. As noted in *Turillo v. Tyson,* 535 F.Supp. 577, 584 (D.R.I.1982), however, "[e]very appellate court deciding this question has found a private cause of action to enforce § 504." *E.g., Miener v. Missouri,* 673 F.2d 969, 973 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 215, 230, 74 L.Ed.2d 171 (1983); *Pushkin v. Regents of University of Colorado,* 658 F.2d 1372, 1378 (10th Cir.1981); *Leary v. Crapsey,* 566 F.2d 863, 865 (2d Cir.1977). This Court joins the present weight of authority and holds that the Rehabilitation Act does authorize a private cause of action to enforce § 504.

■ Although many courts have recently held that exhaustion of administrative remedies is not a prerequisite to bringing a § 504 claim, *see, e.g., Pushkin v. Regents of University of Colorado,* 658 F.2d 1372, 1382 (10th Cir.1981); *Davis v. Southeastern Community College,* 574 F.2d 1158, 1160 (4th Cir.1978), *rev'd on other grounds,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); *Garrity v. Gallen,* 522 F.Supp. 171, 212 (D.N.H.1981), when an action is brought under both the Education for All Handicapped Children Act and the Rehabilitation Act, administrative remedies must be exhausted under the former. *See Davis v. Maine Endwell Central School District,* 542 F.Supp. 1257, 1263 (N.D.N.Y.1982); *Turillo v. Tyson,* 535 F.Supp. 577, 585 (D.R.I.1982); *Colin K. v. Schmidt,* 536 F.Supp. 1375, 1385 n. 14 (D.R.I.1982). For reasons noted, *supra,* however, any further attempt by Plaintiffs in this action to exhaust administrative remedies would have been as futile under the Rehabilitation Act as under the EAHCA, and was therefore unnecessary.

Next, in order to determine whether the Defendants have discriminated against George Hurry based on his handicaps in violation of § 504, it is necessary to evaluate their conduct in light of the Supreme Court's decision in *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). The Court in *Davis* examined the scope of § 504, noting that, "neither the language, purpose, nor history of § 504 reveals an intent to impose an affirmative-action obligation on all recipients of federal funds." *Id.* at 411, 99 S.Ct. at 2369. The Court cautioned, however, that it would be difficult at times to determine whether a defendant's action constituted "a lawful refusal to extend affirmative action" or unlawful discrimination against a handicapped person, stating that "situations may arise where a refusal to modify an existing program might become unreasonable and discriminatory." *Id.* at 412–13, 99 S.Ct. at 2370. "Technological advances can be expected to enhance opportunities to rehabilitate the handicapped[,]" said the Court, and "[s]uch advances also may enable attainment of these goals without imposing undue financial and administrative burdens upon a State." *Id.* at 412, 99 S.Ct. at 2370.

Turning to an examination of the facts in the present action, this Court finds the two-tier analysis of alleged § 504 violations established by Senior Judge Pettine in *Turillo v. Tyson, supra,* 535 F.Supp. at 587, to be helpful. First, would transporting George Hurry to school have placed an obligation on the Defendants to extend affirmative action? In other words, "is the defendant being asked to provide the plaintiff with a completely new service, or merely with modifications of an existing service provided to non-handicapped persons?" *Id.* Clearly, transportation to and from public schools is an existing service provided to non-handicapped children. Modifications, such as special buses or vans accessible by wheelchair and aides to assist children on and off the buses, are obviously necessary in order to transport nonambulatory, physi-

cally handicapped children such as George. They are also required by state law and regulations in effect for many years antedating the onset of George's problems and the requirements were known thoroughly by school officials.

Where Plaintiffs are merely seeking modification of an existing program, the *Turillo* analysis suggests moving on to the second tier, that is, "do the modifications place an undue financial and administrative burden on the defendant?" *Id.* "If they do not, then the plaintiff is entitled to relief." *Id.*

■ This Court holds that finding an appropriate way in which to get George Hurry from his home onto a school bus would not have placed an undue financial or administrative burden on the Defendants, and the Plaintiffs are therefore entitled to relief. Public school buses and vans accessible by wheelchair, and special aides to assist students in and out of these vehicles, are already a required part of the existing transportation program of the Providence public schools. A number of financially and administratively feasible modifications could have been carried out with little difficulty or additional expense, including the ultimate solution agreed upon by the Plaintiffs and the Defendants. (The parties formally agreed that a school minibus would arrive early enough each morning so that Mr. Hurry could carry George down the stairs, and at the end of each school day George would be transported from the Meeting Street School to the Pleasant View School for a one-on-one program until Mr. Hurry could leave his job and take George home. Shortly thereafter, however, arrangements were made to open a gate between the Hurrys' backyard and the backyard of the adjoining property, which at that time belonged to Mrs. Hurry's parents. Because there was a sloping driveway on the adjoining property, Mrs. Hurry was then able to wheel George down to the school bus by herself, without any difficulty.)

There are divergent views as to whether money damages are included among the types of relief available to redress a § 504 grievance. After a well-reasoned analysis, the Eighth Circuit Court of Appeals in *Miener v. Missouri*, 673 F.2d 969 (8th Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 215, 230, 74 L.Ed.2d 171 (1983), recently held that damages are available as a necessary remedy under § 504. *Id.* at 979. The Eighth Circuit noted that, "the administrative enforcement remedies provided under the Rehabilitation Act are of little comfort to the individual plaintiff." *Id.* at 978. Unlike the EAHCA, the Rehabilitation Act does not contain procedures by which individual plaintiffs may present evidence or participate in the investigation of their claims, nor does the Act give plaintiffs the right to object to the findings of the Department of Health and Human Services, or seek administrative review. *See generally* 45 C.F.R. §§ 80.6–81.10 (1981). The primary and ultimate sanction for discrimination under the Act is a termination of federal funds. 45 C.F.R. § 80.8. The *Miener* court also pointed to the legislative history of the 1978 amendments to the Rehabilitation Act, finding support for a damages remedy in the fact that the House-Senate Conference Committee rejected the Senate recommendation that no civil action be brought for monetary damages under the section regarding vocational rehabilitation services. H.R.Rep. 95–1780, 95th Cong., 2d Sess., *reprinted in* [1978] U.S.Code Cong. & Ad.News 7312, 7375, 7379.

■ This Court agrees with the Eighth Circuit that the administrative remedies under the Rehabilitation Act "are inadequate to vindicate individual rights and that Congress could not have expected the individual plaintiff to be made whole through administrative procedures." *Miener, supra* at 978. Therefore, under § 504 of the Rehabilitation Act, Plaintiff George Hurry is entitled to compensatory damages for his pain and suffering caused by the Defendants' discriminatory conduct. *See also Gregg B. v. Board of Education of Lawrence School District,* 535 F.Supp. 1333, 1339–40 (E.D.N.Y.1982); *Patton v. Dumpson,* 498 F.Supp. 933, 937–39 (S.D.N.Y.1980); *Poole v. South Plainfield Board of Education,* 490 F.Supp.

948, 949 (D.N.J.1980); *Hutchings v. Erie City and County Library Board of Directors,* 516 F.Supp. 1265, 1268 (W.D.Pa. 1981) (allowing claims for damages under § 504 of the Rehabilitation Act). *But see Ruth Anne M. v. Alvin Independent School District,* 532 F.Supp. 460, 471 (S.D.Tex. 1982); *Boxall v. Sequoia Union School District,* 464 F.Supp. 1104, 1112 (N.D.Cal.1979) (holding that damages are not available remedy under § 504). George was denied services to which he clearly was entitled because of his handicap. The undue delay in providing appropriate transportation for George initially caused the child severe discomfort while spending hours in his father's van each afternoon, and a loss of sleep because of the resulting muscle pain. Ultimately, George's physical and self-help skills regressed because he was totally without physical or occupational therapy from December of 1977 through June of 1979. George is awarded the sum of $5,000 as compensation for those injuries.

Plaintiffs have also alleged various denials of their rights under Article XII, Section 1 of the Constitution of Rhode Island, and Title 16, Chapter 24 of the General Laws of Rhode Island, entitled "Handicapped Children." The Rhode Island Supreme Court has held that R.I.Gen.Laws § 16–24–1 "must be viewed in the context of the Education for All Handicapped Children Act of 1975, ... 20 U.S.C.A. §§ 1401–1461 (West 1978)." *Smith v. Cumberland School Committee,* 415 A.2d 168, 172 (R.I.1980). That is precisely what this Court has done in its analysis of the Defendants' alleged violations of the state statute, and of the regulations of the Board of Regents for Education promulgated thereunder. No further discussion is necessary.

■ Section 1 of Article XII of the Constitution of Rhode Island provides as follows:

Duty of general assembly.—The diffusion of knowledge, as well as of virtue, among the people, being essential to the preservation of their rights and liberties, it shall be the duty of the general assembly to promote public schools, and to adopt all means which they may deem necessary and proper to secure to the people the advantages and opportunities of education.

Plaintiffs' argument that under the facts of this case the Defendants have denied them their rights under this Article was not adequately developed, but was simply "tossed in the air" for this Court to juggle. Under the holding of *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), pendent jurisdiction is a doctrine of discretion. *Id.* at 726, 86 S.Ct. at 1139. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Id.* A determination of this state constitutional issue is not necessary in order to grant Plaintiffs appropriate relief, and should in any event be decided by a state tribunal.

■ Finally, in the "Damages" and "Conclusion" sections of their post-trial memorandum of Law, Plaintiffs request an award of attorney's fees. Nowhere in this memorandum, however, do they offer a discussion of any legal basis upon which the Court should decide this question. It is possible that Plaintiffs seek attorney's fees under 42 U.S.C. § 1988, as prevailing parties in a § 1983 action. Because of this Court's decision that a § 1983 action to enforce rights under the EAHCA is inconsistent with congressional intent, however, the Plaintiffs may not avail themselves of § 1988. *See also Tatro v. State of Texas,* 516 F.Supp. 968, 984 (N.D.Tex.1981) ("Where § 1983 has no greater role than the statute it purportedly 'enforces,' its citation will not trigger the § 1988 attorney fee provisions."); *Noe v. Ambach,* 542 F.Supp. 70, 73 (S.D.N.Y.1982) (citing *Tatro v. State of Texas* with approval; court held that permitting use of § 1983 for sole purpose of obtaining attorney's fees would be inconsistent with Congress' failure to include provision for attorney's fees under EAHCA).

The Rehabilitation Act of 1973 specifically provides for an award of attorney's fees under certain circumstances. 29 U.S.C. § 794a(b) provides:

In any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

Accordingly, Plaintiffs' attorney is directed to submit an affidavit detailing his time, services and costs applied in this action for the Court's consideration. This affidavit is to be submitted no later than thirty days following the filing of this opinion.

In summary Plaintiffs George and Maureen Hurry are awarded damages in the amount of $5750 and George is awarded damages in the amount of $13,796 and reasonable attorney's fees and costs.

SO ORDERED.